382 A.2d 442

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Theodore MOODY.**

Supreme Court of Pennsylvania.

Argued April 4, 1977.
Decided Nov. 30, 1977.

Nix, J., dissented with an opinion.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Deborah E. Glass, Asst. Dist. Atty., for appellant.

John Rogers Carroll, Joseph D. Montgomery III, Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, POMEROY, NIX, and MANDERINO, JJ.

## OPINION

EAGEN, Chief Justice.

In this appeal by the Commonwealth we are asked to determine the constitutionality of section 1311 of the Sentencing Code, 18 Pa. C.S.A. § 1311 (Supp. 1977–78), which establishes sentencing procedures and standards regulating jury determinations of whether or not the death penalty should be imposed as punishment for murder, and which a panel of the Court of Common Pleas of Philadelphia held to be unconstitutional. We shall affirm.

### I

Appellee Theodore Moody was convicted by a jury of murder of the first degree and criminal conspiracy in the death on December 29, 1974, of one James Price, a fellow inmate at Holmesburg Prison in Philadelphia. Pursuant to section 1311(c) of the Sentencing Code,[1] a hearing was then

---

1. **"Procedure at sentencing hearing.**—After such verdict is recorded and before the jury is permitted to separate, the court shall proceed to receive such additional evidence not previously received from the trial as may be relevant and admissible upon the question of aggravating and mitigating circumstances and shall permit such argument by counsel, and deliver such charge thereon as may be just and proper in the circumstances. Aggravating circumstances must be proved beyond a reasonable doubt. Mitigating circumstances must be proved by a preponderance of the evidence. The jury shall then retire and consider the aggravating and mitigating circumstances and render such verdict respecting them as they shall agree upon. A failure of the jury to agree upon the aggravating and mitigating circumstances shall not be held to impeach or in any way affect the validity of the verdict already recorded, and whenever the court shall

held to permit the jury to receive additional testimony and arguments on the question of aggravating and mitigating circumstances. In order to establish aggravating circumstances, the Commonwealth called an assistant United States attorney from Washington, D. C., who testified that Moody had previously been convicted in the District of Columbia of seven counts of premeditated and deliberate first-degree murder and seven counts of first-degree felony-murder, and that he had been sentenced to a term of twenty years to life imprisonment on each count.[2] During cross-examination the witness testified that Moody's appeals attacking these convictions were still pending. The Commonwealth also argued to the jury that the evidence adduced at trial indicated the killing of Price was "committed by means of torture," another statutory aggravating circumstance.[3] In an effort to establish statutory mitigating circumstances, the defense called Moody's mother, who testified to her son's age—twenty-one at the time of the killing—and her belief

be of the opinion that further deliberation by the jury will not result in an agreement upon the aggravating and mitigating circumstances, it may, in its discretion, discharge the jury from further consideration thereof, in which event if no retrial is directed, the court shall sentence the defendant to life imprisonment upon the verdict theretofore rendered by the jury and recorded as aforesaid and the jury shall be so informed prior to their deliberations. The court shall impose the sentence so fixed as in the other cases."

**2.** Section 1311(d)(1)(ix) lists the following statutory aggravating circumstance:

"The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense."

Moody's previous murder convictions had been based upon the deaths of seven persons in the highly publicized Hanafi Muslim killings of January 16, 1973. His confinement in Holmesburg Prison at the time of the instant murder was unrelated to these convictions. During the instant trial, however, the Commonwealth presented evidence that the victim, Price, had given a statement to the police and grand jury testimony implicating Moody in the District of Columbia killings, and that Moody had been aware that Price had implicated him.

**3.** 18 Pa. C.S.A. § 1311(d)(1)(viii).

that he was not "quite mature" and that he was "easily led."[4] After further deliberations the jury returned with a finding that the killing of Price was accompanied by aggravating circumstances and no mitigating circumstances. Although this finding required the imposition of the death penalty,[5] the court deferred formal sentencing pending the disposition of post-verdict motions.

Subsequently, a three-judge post-verdict motions court denied Moody's motions in arrest of judgment and for a new trial, but a majority of that court concluded that to impose the death penalty on Moody would be unconstitutional on two grounds. First, the statutory mitigating circumstances were found "unconstitutionally vague because a reasonable jury would have to guess at the meaning of 'age,' 'youth' and 'lack of maturity,' " with "arbitrary and capricious decisions . . . an inevitable result." Second, the court concluded that because at the time of Moody's trial this Court had promulgated no procedural rules for imposition of the death penalty by trial courts in non-jury trials or guilty-plea proceedings,[6] trial courts had no power to impose the death penalty in such contexts, and that therefore, pursuant to *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), the imposition of the death penalty after a jury trial "placed a chilling and unconstitutional burden upon the exercise of the constitutional right to trial by jury." One judge concurred solely on the *Jackson* ground.

**4.** Section 1311(d)(2)(i) lists as mitigating "[t]he age, lack of maturity, or youth of the defendant at the time of the killing."

**5.** "**Aggravating and mitigating circumstances.**—If a murder of the first degree is accompanied by at least one of the following aggravating circumstances and none of the following mitigating circumstances, the person convicted shall be sentenced to death. If a murder of the first degree is not accompanied by any of the following aggravating circumstances or is accompanied by at least one of the following mitigating circumstances the person convicted shall be sentenced to life imprisonment . . . ." 18 Pa. C.S.A. § 1311(d).

**6.** "**Guilty pleas and non-jury trials.**—In cases of pleas of guilty, or trial by court, the court shall impose sentence in accordance with Rules of Criminal Procedure as promulgated by the Supreme Court of Pennsylvania." 18 Pa. C.S.A. § 1311(e).

The court certified that its decision on the death penalty involved a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal might materially advance the ultimate determination of the matter, and it stayed all proceedings meanwhile; we allowed the appeal.[7]

In addition to arguing in support of the grounds advanced by the post-verdict motions court for holding imposition of the death penalty unconstitutional, Moody also urges, as he did below, that section 1311 unconstitutionally restricts the evidence the jury may consider in mitigation of the penalty. We agree. Accordingly, in affirming the order of the Court of Common Pleas, we do not reach the grounds which that court found decisive.[8]

II

In *Commonwealth v. Bradley,* 449 Pa. 19, 295 A.2d 842 (1972), this Court recognized that the Supreme Court of the United States, by its decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), had in effect invalidated Pennsylvania's prior death-penalty statute[9] as

7. See Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, No. 223, Art. V, § 501(b); 17 P.S. § 211.501(b) (Supp. 1977–78). The only issues involved in the present appeal are those relating to the constitutionality of the death penalty. The Attorney General of Pennsylvania has intervened and filed a brief in support of the Commonwealth's position; the American Civil Liberties Union, greater Philadelphia branch, and the American Civil Liberties Foundation of Pennsylvania have filed an *Amicus Curiae* brief in support of Moody.

8. Moody also contends that imposition of the death penalty is a *per se* violation of Art. I, § 13, of the Pennsylvania Constitution, which proscribes the infliction of "cruel punishments." This contention was not advanced below and is asserted on appeal in response to the appellant Commonwealth's argument that the death penalty does not *per se* violate the Pennsylvania Constitution. In view of our disposition of this appeal, we do not reach this issue.

9. Act of June 24, 1939, P.L. 872, § 701, *as amended,* 18 P.S. § 4701. At the time it decided *Furman,* the Supreme Court in fact vacated two death sentences imposed pursuant to this statute. *Phelan v. Brierley,* 408 U.S. 939, 92 S.Ct. 2875, 33 L.Ed.2d 762 (1972); *Scoleri*

violative of the Eighth and Fourteenth Amendments. Section 1311 was enacted in 1974 [10] by the Pennsylvania legislature in an effort to cure what were perceived to be the constitutional defects of the invalidated statute. See *Commonwealth ex rel. Fitzpatrick v. Bullock*, 471 Pa. 292, 370 A.2d 309 (1977).

Section 1311 retains the split-verdict provisions of the previous statute; that is, if the jury finds the defendant guilty of murder of the first-degree, it then proceeds to hear additional evidence and arguments and to render a separate verdict with regard to the penalty. The new statute, however, in an effort to avoid the untrammeled discretion and lack of standards for determining the penalty condemned in *Furman*,[11] both limits the death penalty to murders of the first degree which the jury finds to be accompanied by at least one of nine specified aggravating circumstances and by none of three specified mitigating circumstances and requires that it be imposed when such a finding is made. The statute also provides that aggravating circumstances must be proved beyond a reasonable doubt and mitigating circum-

*v. Pennsylvania*, 408 U.S. 934, 92 S.Ct. 2852, 33 L.Ed.2d 747 (1972). See *Commonwealth v. Martin*, 465 Pa. 134, 348 A.2d 391 (1975).

**10.** Act of December 6, 1972, P.L. 1482, No. 334, § 1311, added March 26, 1974, P.L. 213, No. 46, § 3, imd. effective. On December 30, 1974, the section was reenacted without change and made part of the new Sentencing Code. Section 1102 of the Crimes Code, enacted on December 6, 1972, and effective on June 6, 1973, had merely provided that "[a] person who has been convicted of a murder of the first degree shall be sentenced to death or to a term of life imprisonment" without establishing any procedures or standards to be utilized in determining the appropriate sentence. 18 Pa. C.S.A. § 1102. On March 26, 1974, section 1102 was amended to conform with the new section 1311. 18 Pa. C.S.A. § 1102 (Supp. 1977–78).

**11.** Because the *per curiam* decision in *Furman* merely held that the statutes there at issue were unconstitutional, with the five justices who concurred in the result each writing a separate opinion and not joining in any of the others, the full meaning and scope of that decision were difficult to discern. Of the approximately 35 states that enacted new death-penalty legislation in response to *Furman*, over half adopted mandatory death penalties for specified crimes, while the rest adopted statutes providing for various forms of limited discretion. *Rockwell v. Superior Court*, 18 Cal.3d 420, 134 Cal.Rptr. 650, 556 P.2d 1101, 1118 (1976) (Concurring Opinion, Clark, J.).

stances by a preponderance of the evidence and further provides for automatic review by this Court of all death sentences. See 18 Pa. C.S.A. § 1311(g). The result clearly is to reduce substantially the scope of discretion in jury determinations of the penalty for murder of the first degree.

## III

Last year the United States Supreme Court addressed itself for the first time to the constitutionality of death-penalty statutes enacted subsequent to *Furman.* In a series of five decisions announced on the same day, that Court found the new statutes of Georgia, Texas, and Florida constitutional and invalidated statutes from North Carolina and Louisiana.[12] None of the statutes there involved corresponds precisely with the Pennsylvania statute here at issue, but we must look to these decisions, as well as to subsequent pronouncements by the Supreme Court, for guidance in determining the constitutionality of section 1311. Our task is complicated by the fact that no clear majority view with regard to ascertaining the constitutionality of a capital-punishment statute has emerged from these decisions. Justices Brennan and Marshall would have invalidated all five of the statutes at issue in the 1976 cases because of their consistently-expressed view that the death penalty in all circumstances constitutes cruel and unusual punishment. Chief Justice Burger and Justices White, Blackmun, and Rehnquist would have found all five constitutional. The decisions of the Court were thus controlled by a "plurality" consisting of Justices Stewart, Powell, and Stevens which in each case constituted part of the decisional majority with one of these justices writing the opinion announcing the judgment of the Court. The conclusion which emerges from these decisions is that the death penalty as a punishment for murder is not,

12. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Stanislaus Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

at least at present, inevitably cruel and unusual punishment in violation of the Eighth Amendment,[13] but that a statute authorizing capital punishment for even a narrowly-limited category of murder violates the Eighth Amendment if it does not sufficiently permit the sentencing authority in determining the sentence to take into account the particular circumstances of the crime and the individual history and character of the criminal. See *Harry Roberts v. Louisiana*, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977).

The Supreme Court plurality in effect appears to have discerned an element of due process in the Eighth Amendment which is applicable to sentencing in capital cases.[14] Thus, in the words of Mr. Justice Stewart:

"This Court has previously recognized that '[f]or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.' *Pennsylvania v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 61, 82 L.Ed. 43 (1937). Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. See *Williams v. New York*, 337 U.S. 241, 247–249, 69 S.Ct. 1079, 1083–1084, 93 L.Ed. 1337 (1949); *Furman v. Georgia*, 408 U.S. 238, at 402–403, 92 S.Ct. 2726, at 2810–2811 (Burger, C. J., dissenting). While the prevailing practice

**13.** In *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), a majority of the Court concluded that death in all circumstances is cruel and unusual punishment for the crime of rape.

**14.** See Comment, Resurrection of Capital Punishment—The 1976 Death Penalty Cases, 81 Dickinson Law Rev. 543, 564–66 (1977). In *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), a majority of the Supreme Court had held that the absence of sentencing standards or bifurcated proceedings in capital cases did not violate due process. But see *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), in which at least five justices concluded that the failure of a trial judge to make available to the defendant and his counsel a confidential sentencing report which the judge utilized in determining that the death penalty should be imposed violated due process.

of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see *Trop v. Dulles*, 356 U.S. 86, at 100, 78 S.Ct. 590, at 597, 2 L.Ed.2d 630 (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

"This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." [Footnote omitted.]

*Woodson v. North Carolina*, supra, 428 U.S. at 304–5, 96 S.Ct. at 2991–92. Moreover, as stated by Mr. Justice Stevens:

" . . . a sentencing system that allowed the jury to consider only aggravating circumstances would almost certainly fall short of providing the individualized sentencing determination that we today have held in *Woodson v. North Carolina, post*, 428 U.S. 280, pp. 303–305, 96 S.Ct. 2978, pp. 2991–2992, 48 L.Ed.2d 944, to be required by the Eighth and Fourteenth Amendments. For such a system would approach the mandatory laws that we today hold unconstitutional in *Woodson* and *Roberts v. Louisiana, post*. *A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.*" [Footnote omitted.] [Emphasis added.]

*Jurek v. Texas*, supra, 428 U.S. at 271, 96 S.Ct. at 2956.

We must determine, therefore, whether section 1311 permits the jury to consider sufficiently "the character and

record of the individual offender" and, in particular, whether it permits the jury to consider "on the basis of all relevant evidence" why a death sentence should not be imposed. Plainly, unlike the mandatory North Carolina and Louisiana statutes struck down by the Supreme Court, the Pennsylvania statute does permit the jury in determining punishment to go beyond the crime itself and consider some mitigating circumstances. For this reason, the Commonwealth would have us uphold section 1311 as essentially similar to the Georgia, Florida, and Texas statutes the Court found constitutional. Clearly in bifurcating the guilt and penalty phases of the trial, in limiting the death penalty to murders of the first degree attended by specific aggravating circumstances, and in providing for automatic appellate review of all death sentences, the legislature has adopted procedures for the protection of defendants in capital cases which have been specifically approved and endorsed by the Supreme Court. See *Gregg v. Georgia*, supra; *Proffitt v. Florida*, supra. In our view, however, the constitutional defect of section 1311 is that, unlike the statutes approved by the Supreme Court, it so narrowly limits the circumstances which the jury may consider mitigating that it precludes the jury from a constitutionally adequate consideration of the character and record of the defendant.

Section 1311(d) limits the circumstances which the jury is to consider mitigating to "the following mitigating circumstances" and lists three:

"(2) Mitigating circumstances:

(i) The age, lack of maturity, or youth of the defendant at the time of the killing.

(ii) The victim was a participant in or consented to the defendant's conduct as set forth in section 1311(d) of this title or was a participant in or consented to the killing.

(iii) The defendant was under duress although not such duress as to constitute a defense to prosecution under section 309 of this title (relating to duress)."

Of the three listed, only subsection (d)(2)(i) can be said to focus the jury's attention upon the character and record of

the defendant as opposed to the circumstances of the crime, and that only to the limited extent of determining his age, lack of maturity, or youth *at the time of the killing.* Although a prior conviction for an offense punishable by life imprisonment is an aggravating circumstance, the absence of a prior criminal record or even positive achievements or good works cannot be considered as mitigating. Whatever the offender's potential for rehabilitation, his life is to be terminated without consideration of it unless his status or situation at the time of the killing can be found to be a mitigating circumstance.[15]

In contrast, the statute approved in *Gregg v. Georgia,* supra, while limiting the sentencing authority's power to impose the death penalty for murder to situations in which it finds beyond a reasonable doubt at least one statutory aggravating circumstance, does not even mention specific mitigating circumstances other than the absence of prior convictions; in directing the sentencing authority to weigh aggravating and mitigating factors, it thus gives defendant and sentencing authority wide latitude as to the type of mitigating evidence he may present and it may consider, and a recommendation of mercy by the jury is binding upon the trial court without any finding of a specific mitigating circumstance. With regard to jury determinations of the penalty, the Supreme Court plurality emphasized that "accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die" if the jury is to fulfill its role in capital cases of maintaining " 'a link between contemporary values and the penal system.' " Id., 428 U.S. at 190, 96 S.Ct. at 2933, quoting *Witherspoon v. Illinois,* 391 U.S. 510, 519 n. 15, 88 S.Ct. 1770, 1775 n. 15, 20 L.Ed.2d 776 (1968). Further, the plurality in *Gregg* expressly indicated that, so long as the defendant is not prejudiced thereby, it is preferable not to impose restrictions on the evidence and arguments presented to the jury at the penalty hearing; it also indicated that the

15. We assume, as did the trial court, without deciding that "age" in the statute means "old age" because of its juxtaposition with "youth."

possibility of a jury affording mercy to a particular defendant did not render the procedure unconstitutionally arbitrary.

The Florida statute approved in *Proffitt v. Florida,* supra, lists seven mitigating circumstances, significantly including "[t]he defendant has no significant history of prior criminal activity," which are to be weighed against eight statutory aggravating circumstances. In addition, however, the plurality noted that the Florida statute does not limit the mitigating factors which may be considered by the sentencing authority to the statutory mitigating circumstances. Id., 428 U.S. at 250 n. 8, 96 S.Ct. at 2965 n. 8. Further, since the jury's penalty verdict in Florida is only advisory, the judge in sentencing the defendant may also make use of a presentence investigation report, which may also present mitigating factors relevant to the offender's character and record. Id., 428 U.S. at 252 n. 9, 96 S.Ct. at 2966 n. 9. See also *Gardner v. Florida,* supra. Thus, in Florida also there appears to be essentially no limitation on the mitigating factors which the defendant may have the sentencing authority consider.

The Commonwealth argues that section 1311 is actually more favorable to offenders in that it mandates a life sentence if the jury finds a mitigating circumstance, while the Georgia and Florida statutes allow the imposition of the death penalty if the aggravating circumstances outweigh the mitigating circumstances. This distinction, however, is helpful only if the defendant is able to establish one of the narrow mitigating circumstances mentioned in section 1311(d). *Gregg* and *Proffitt* suggest, rather, that the sentencing authority must be given the opportunity to weigh and consider in mitigation whatever evidence might be relevant to passing an informed judgment upon the defendant.[16]

16. The Commonwealth also points out that the sentencing scheme of section 1311 derives from the Model Penal Code, which was quoted with approval by the *Gregg* plurality, and urges that the mitigating circumstances in section 1311 are essentially the same as those found in the Model Code. The Commonwealth, however, overlooks

This view is fortified by an examination of *Jurek v. Texas,* supra. The Texas statute there approved limits capital-murder to five situations, which the plurality concluded were comparable to the aggravating circumstances specified by Georgia and Florida. After a defendant is convicted of capital-murder in Texas, a sentencing proceeding follows during which the jury is required to answer three questions based upon the evidence it has heard. For the death penalty to be imposed, the state must prove beyond a reasonable doubt that the answer to each question is yes. One of these questions, which in effect raise the issue of mitigating circumstances, focuses upon the character and record of the defendant. The jury is thereby asked to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." In finding the Texas statute constitutional, the plurality strongly emphasized that the Texas Court of Criminal Appeals interpreted this question to permit the defendant to present to the jury whatever mitigating evidence he can adduce:

> "Thus, Texas law essentially requires that one of five aggravating circumstances be found before a defendant can be found guilty of capital-murder, and that in considering whether to impose a death sentence the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it.
>
> \*    \*    \*    \*    \*    \*
>
> "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine."

Id., 428 U.S. at 273, 276, 96 S.Ct. at 2957–58.

We thus conclude that what is now constitutionally required with regard to the scope of the evidence in mitiga-

the fact that the Model Code not only specifies a broader range of mitigating circumstances, but it also permits the jury to consider additional evidence in mitigation as well as that relevant to the specified mitigating circumstances. It forbids imposition of the death penalty unless the jury finds a specified aggravating circumstance and "that there are no substantial mitigating factors." Model Penal Code, § 201.6 (Tentative Draft No. 9, 1959).

tion which may be considered by the jury is essentially similar to what had long been Pennsylvania law in capital cases.[17]   As Mr. Justice (later Chief Justice) Benjamin R. Jones put it in *Commonwealth v. Green,* 396 Pa. 137, 148, 151 A.2d 241, 247 (1959):

> "The imposition of the death penalty by a judicial tribunal should be made only when it is the *sole* penalty justified both by the criminal act and the criminal himself and then only after a full and exhaustive inquiry into both the criminal act and the criminal himself.   Time and again in referring to the duty of juries in fixing the penalty between death and life imprisonment we have insisted that the jury exercise its discretion only after it has considered *all* the evidence, culpatory and exculpatory, incriminating and extenuating, including what manner of man the criminal is and has been." [Citations omitted.] [Emphasis in original.]

Thus, in our view, in order to protect a defendant from cruel and unusual punishment in a capital case, it is now necessary both that the aggravating circumstances that will justify the imposition of the death penalty be clearly defined for the sentencing authority, *and* that the sentencing authority be allowed to consider whatever mitigating evidence relevant to his character and record the defendant can present.

## IV

The Commonwealth argues that section 1311 may be liberally interpreted to permit the defendant to introduce a broad range of mitigating evidence at the penalty hearing. Section 1311(c) provides that "the court shall proceed to receive such additional evidence not previously received from the trial as may be relevant and admissible upon the question of aggravating and mitigating circumstances," but section 1311(d) expressly limits mitigating circumstances to

**17.**   In non-capital cases, compare *Commonwealth v. Riggins,* 474 Pa. 115, 377 A.2d 140 (1977); *Commonwealth v. Martin,* 466 Pa. 118, 351 A.2d 650 (1976).

"the following." [18]   Even if this language can be construed as permitting the defendant to present a broad range of mitigating evidence bearing upon his character and record, therefore, clearly the jury, absent consent or duress, can only consider such evidence, or any other relevant evidence presented at trial, to the extent it shows the defendant's age, youth, or lack of maturity at the time of the killing.[19] We thus conclude that, even if it is liberally interpreted, section 1311, unlike the Texas statute approved in *Jurek*, does not permit the sentencing authority in making its ultimate decision to focus sufficiently upon the entire character and record of the offender.[20]

**18.** In contrast, the Act of 1939 *as amended* provided that "the court shall proceed to receive such additional evidence not previously received in the trial *as may be relevant and admissible upon the question of the penalty to be imposed upon the defendant.*" [Emphasis added.]   18 P.S. § 4701.

**19.** Contrary to implications in the dissenting opinion of Mr. Justice Nix, we do not assume that evidence of an offender's previous history and background would be irrelevant to determining his maturity or lack thereof at the time of the killing.   The problem is that, in making its ultimate determination of whether or not mitigating circumstances exist, the jury is restricted by the statute to his status or situation *at the time of the killing.*   We cannot presume that the jury will nullify its instructions and disregard the law as to the circumstances it may find mitigating.   Of course, if the penalty determination were to depend upon "a particular jury's willingness to act lawlessly," the arbitrariness and lack of standards in sentencing condemned in *Furman* would remain.   *Woodson v. North Carolina,* supra, 428 U.S. at 303, 96 S.Ct. at 2991.

**20.** A comparable situation was presented to the Court of Appeals of Maryland when it found that state's death-penalty statute invalid:
"It is true, of course, that [the statute] permits elements of mitigation to be presented to the jury, *i. e.,* proof of the defendant's age and of the motive for the act in the context of resolving the question of the proximate cause of the victim's death.   We are unable to conclude, however, that the presentation of these two elements requires the sentencing authority to focus on the specific circumstances of the crime and the particular characteristics of the offender to the extent constitutionally required by the controlling Supreme Court decisions.   That Blackwell was afforded an opportunity to present, and did present, broad circumstances of mitigation to the jury hardly suffices as the measure of the statute's constitutionality;   the jury was neither required nor permitted by the statute to weigh or objectively focus on Blackwell's character

■ In addition, the Commonwealth argues that, even if section 1311 does not permit sufficient consideration of the character and record of the offender, Moody lacks standing to complain since he offered no evidence of mitigating circumstances other than that of his asserted youth and lack of maturity. The record reveals, however, that Moody's counsel prior to the penalty hearing did object to the insufficient consideration of mitigating circumstances permitted by section 1311. Furthermore, this Court has previously indicated that a person sentenced to death under a statute unconstitutional on its face has standing to complain regardless of the actual proceedings in his case. See *Commonwealth v. Martin*, 465 Pa. 134, 348 A.2d 391 (1975); *Commonwealth v. Dobrolenski*, 460 Pa. 630, 334 A.2d 268 (1975). We thus conclude that Moody does have standing to attack the constitutional deficiencies of section 1311.

Finally, the Commonwealth notes that the plurality of the United States Supreme Court has expressly reserved the question of whether a prisoner already serving a life sentence may be subject to a mandatory death penalty. See *Harry Roberts v. Louisiana*, supra. The Commonwealth therefore contends that, since Moody was serving seven consecutive life sentences at the time of Price's killing, he may constitutionally be sentenced to death regardless of any general constitutional defects in section 1311 relating to mitigating circumstances. The question, however, of a mandatory death sentence for a murderer already serving a life sentence is not properly before us, since section 1311 does not make death mandatory in such circumstances.[21]

and record before returning its verdict and causing the death sentence to be imposed upon him."

*Blackwell v. State*, 278 Md. 466, 473, 365 A.2d 545, 549 (1976). See also *Rockwell v. Superior Court*, 18 Cal.3d 420, 134 Cal.Rptr. 650, 556 P.2d 1101 (1976). But see *State v. Bell*, 48 Ohio St.2d 270, 358 N.E.2d 556 (1976), cert. granted 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1977); *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976), cert. denied 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

21. We note also that Moody was not serving a Pennsylvania life sentence at the time of Price's killing, and that at the time of his

Accordingly, for the reasons stated above, the order of the trial court is affirmed.

ROBERTS, J., took no part in the consideration or decision of this case.

NIX, J., filed a dissenting opinion.

NIX, Justice, dissenting.

The majority has determined that the legislature in drafting Section 1311 of the Sentencing Code, 18 Pa.C.S.A. § 1311 (Supp.1977–78) has failed to meet the standards required under the Eighth and Fourteenth Amendments to the Federal Constitution and consequently holds that the death sentence imposed in this case under Section 1311 must be set aside.[1] My interpretation of the United States Supreme Court decisions that followed *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), leads me to conclude that the Pennsylvania scheme for the imposition of the death penalty in cases of murder of the first degree is in accord with the Federal Constitutional mandates and I therefore must disagree with the conclusion reached by the majority.

I.

In the afternoon of December 29, 1974, the body of James Price, an inmate of Holmesburg Prison, was found hanging by a bedsheet suspended from a grate inside cell 457 of "D" block of the prison by a prison guard.[2] Death was deter-

conviction instantly his sentences in the District of Columbia were still on appeal.

1. Although Theodore Moody, through his counsel, raised the question as to the propriety of the death sentence under Art. I, § 13 of the Pennsylvania Constitution, neither the court en banc nor the majority of this Court considered that issue. I will therefore confine my discussion in this opinion to a consideration of the Federal Constitutional questions raised under the Eighth and Fourteenth Amendments. My decision not to address the problems that might be raised under Art. I, § 13 at this time should not be construed as indicative of my view as to the merits of those issues.

2. Cell block "D" is a maximum security area.

mined to have occurred between four to eight hours prior to the discovery of the body. The pathologist's examination revealed that the cause of death was strangulation. Additionally, it was ascertained that the victim had been tortured and mutilated before death.[3]

Calvin Hunter testified that he was an inmate of the prison at the time in question and that he had been transferred to "D" block on the morning of December 29, 1974, as a consequence of a disciplinary violation of "C" block where he had formerly been assigned. At approximately 9:00 A.M. on that date, Hunter stated that the area became unusually quiet. He then heard noises from the front of the block and as the noise came closer he was able to observe, appellee, Theodore Moody, Theodore Brown and John Griffin with the victim between them.[4] The group proceeded in the direction of cell 457 at which point Hunter heard the victim screaming for help and yelling "They're killing me." When the noise stopped, appellee, Theodore Brown and John Griffin retraced their steps past Hunter's cell going in the opposite direction. Hunter called out to Griffin and inquired as to the reason for the noise. In response, Griffin stated, "Nothing that concerns you."

The Commonwealth also presented evidence as to the question of motive. The victim, Price, had cooperated with Federal authorities and testified before the grand jury relating to the Hanafi Muslim murders which occurred in Washington, D. C., on January 16, 1973. The testimony of the victim implicated Theodore Moody in the Hanafi massacre. As a result, Moody was indicted, charged and convicted of 14 counts of murder. On the day in question, Moody was aware that Price had cooperated with the Federal authori-

3. The instrument causing death was a ligature or garrote fashioned from three shoe laces, which was secured around the victim's neck. There were numerous recent injuries on the body; the most noticeable were in the area of the testicles and rectum. These injuries were determined to have been caused by multiple insertions of a sharp instrument that would have caused excruciating pain.

4. Hunter described their respective positions as being somewhat like a football huddle with Price in between the three men.

ties in bringing about his conviction for the Washington crimes.[5]

## II.

Under the statutory scheme providing for the imposition of the death penalty by a jury in this jurisdiction, an accused must first be found guilty of murder of the first degree. Murder of the first degree is defined as a criminal homicide committed by an intentional killing. 18 Pa.C.S.A. § 2502(a) (Supp.1977–78). An intentional killing is further defined as a killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing. 18 Pa.C.S.A. § 2502 (Supp.1977–78). Pennsylvania has continued its practice of a bifurcated procedure in which the question of sentence is not considered until the determination of guilt has been made. 18 Pa.C.S.A. § 1311 (Supp. 1977–78). During the sentencing hearing the parties may introduce "such additional evidence not previously received from the trial as may be relevant and admissible upon the question of aggravating and mitigating circumstances". 18 Pa.C.S.A. § 1311(c) (Supp.1977–78). Argument by counsel is also permitted. Section 1311 further specifies nine aggravating circumstances and three mitigating circumstances.[6]

---

**5.** The instant killing occurred on December 29, 1974. Moody had been convicted on May 17, 1974, for the Hanafi murders and was sentenced to seven consecutive life sentences. Although it is not clear from the record why Moody was being detained in Holmesburg Prison in Philadelphia rather than in some federal facility, it appears that he was convicted on eleven counts of aggravated robbery, burglary and rape in January of 1975. These crimes were committed in this jurisdiction and it is very probable that his detention at Holmesburg was in connection with the processing of these charges.

**6.** Section 1311(d) provides:

 **(d) Aggravating and mitigating circumstances.**—If a murder of the first degree is accompanied by at least one of the following aggravating circumstances and none of the following mitigating circumstances, the person convicted shall be sentenced to death. If a murder of the first degree is not accompanied by any of the following aggravating circumstances or is accompanied by at least one of the following mitigating circumstances the person convicted shall be sentenced to life imprisonment:

(1) Aggravating circumstances:

The jury is to be instructed as to the various mitigating and aggravating circumstances and advised that a sentence of death may not be imposed unless they find the existence of one or more aggravating circumstances beyond a reasonable doubt and determine that none of the statutorily enumerated mitigating circumstances are present. The decision to return the sentence of death must be unanimous, thus the failure to agree upon the aggravating and mitigating circumstances will result in the imposition of a life sentence. As indicated above, the aggravating circumstances must be proved beyond a reasonable doubt but the existence of the

(i) The victim was a fireman, peace officer or public servant concerned in official detention as defined in section 5121 of this title (relating to escape), who was killed in the performance of his duties.

(ii) The defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.

(iii) The victim was being held by the defendant for ransom or reward, or as a shield or hostage.

(iv) The death of the victim occurred while defendant was engaged in the hijacking of an aircraft.

(v) The victim was a witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses.

(vi) The defendant committed a killing while in the perpetration of a felony.

(vii) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

(viii) The offense was committed by means of torture.

(ix) The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

(2) Mitigating circumstances:

(i) The age, lack of maturity, or youth of the defendant at the time of the killing.

(ii) The victim was a participant in or consented to the defendant's conduct as set forth in section 1311(d) of this title or was a participant in or consented to the killing.

statutory mitigating circumstances need only be shown by a preponderance of the evidence.

In addition to the conventional appellate process available in all criminal cases, which in this Commonwealth provides that there is a direct appeal in homicide cases to the Supreme Court,[7] provision is made for special expedited direct review by the Supreme Court of Pennsylvania "within 60 days after certification by the sentencing court of the entire record." 18 Pa.C.S.A. § 1311(g) (Supp.1977–78). The law of this Commonwealth also provides that a death sentence may be commuted by executive clemency. Art. 4, § 9 of the Pennsylvania Constitution.

### III.

Responding to the United States Supreme Court's decision in the case of *Furman v. Georgia, supra,* this Court struck down the Pennsylvania statute then in effect[8] as violative of the Eighth and Fourteenth Amendments of the Federal Constitution. *Commonwealth v. Bradley,* 449 Pa. 19, 295 A.2d 842 (1972). *See also, Commonwealth v. Dobrolenski,* 460 Pa. 630, 334 A.2d 268 (1975); *Commonwealth v. Scoggins,* 451 Pa. 472, 304 A.2d 102 (1973); *Commonwealth v. Ross,* 449 Pa. 103, 296 A.2d 629 (1972); *Commonwealth v. Lopinson,* 449 Pa. 33, 296 A.2d 524 (1972); *Commonwealth v. Sharpe,* 449 Pa. 35, 296 A.2d 519 (1972). Thereafter, the legislature enacted Section 1102 which became effective June 6, 1973. 18 Pa.C.S.A. § 1102. Section 1102 provided:

"A person who has been convicted of a murder of the first degree shall be sentenced to death or to a term of life imprisonment."

(iii) The defendant was under duress although not such duress as to constitute a defense to prosecution under section 309 of this title (relating to duress).

7. The jurisdiction of this Court over the instant appeal is found in the Appellate Court Jurisdiction Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1976–77).

8. Act of June 24, 1939, P.L. 872, § 701, as amended, 18 P.S. § 4701.

This section was distinguished by a complete lack of direction as to the circumstances that would warrant imposition of the death penalty. Additionally, at that time the murder statute was designed to include willful and deliberate killings as well as felony murders under the category of murder of the first degree. 1972, Dec. 6, P.L. 1482, No. 334, § 1, eff. June 6, 1973; 18 Pa.C.S.A. § 2502(a).[9] It would appear that Section 1102 was not passed in an effort to meet the objections raised in *Furman,* but rather for the sole purpose of providing some legislative authority for the imposition of a death sentence until an appropriate scheme pursuant to the *Furman* mandate could be formulated. Present Section 1311 is the provision which the legislature designed in an effort to fulfill the *Furman* requirements.

## IV.

The quintet of cases handed down by the United States Supreme Court on July 2, 1976[10] answered the question left open by that Court's decision in *Furman.* These cases make it clear that a state can design a procedure for the imposition of the death penalty for murder of the first degree that may be found to be consistent with the mandates of the Eighth and Fourteenth Amendments to the satisfaction of a majority of the members of the United States Supreme Court as it is presently constituted. The task is complicated however by the fact that the differing views expressed in

---

**9.** This section provided:

   **(a) Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate, and premeditated killing. A criminal homicide constitutes murder of the first degree if the actor is engaged in or is an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary, or kidnapping.

**10.** *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Stanislaus Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

*Furman* have yet to congeal to an extent where there is a consensus by a clear majority of Justices as to those factors which must be present to assure compliance with the constitutional standards. Mr. Justice BRENNAN and Mr. Justice MARSHALL have maintained their view that the Federal Constitution prohibits capital punishment for all crimes under all circumstances. Mr. Chief Justice BURGER and Justices BLACKMUN and REHNQUIST, dissenters in *Furman,* have continued to find all of the statutory schemes considered by that Court to comport with their concept of the Eighth and Fourteenth Amendments. Mr. Justice WHITE, although concurring in the result in *Furman,* has since been aligned with the Chief Justice and Justices BLACKMUN and REHNQUIST. Up to this point the constitutionality of a statutory scheme for the imposition of the death sentence has been dependent upon the view of a plurality consisting of Mr. Justices STEWART, POWELL (a dissenter in *Furman* ) and STEVENS. Thus, it is legitimate to conclude that if section 1311 provides a statutory scheme acceptable under the standards articulated by this "plurality" it would more than likely withstand a constitutional challenge in the Federal system.

Turning to an analysis of the view of the "plurality", it is apparent that although they have agreed that the punishment of death is not per se violative of the Federal Constitution, *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), a statutory scheme may run afoul of the constitutional mandates if it is not in accord with the "evolving standards of decency that mark the progress of a maturing society." In ascertaining these "evolving standards of decency", the "plurality" has suggested that an assessment of contemporary values and a determination of whether the penalty is in accord with "the dignity of man" are relevant considerations.[11] The plurality has also sug-

11. "A penalty also must accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.' *Trop v. Dulles,* supra, 356 U.S. [86], at 100, 78 S.Ct. [590], at 597 (plurality opinion). This means, at least, that the punishment not be 'excessive.' When a form of punishment in the abstract (in this case,

gested that in any assessment of a statutory scheme promulgated by the legislature, there should be a heavy burden upon those "who would attack the judgment of the representatives of the people." [12]   Utilizing these basic propositions the "plurality" concluded:

> whether capital punishment may ever be imposed as a sanction for murder) rather than in the particular (the propriety for a specific crime) is under consideration, the inquiry into 'excessiveness' has two aspects.  First, the punishment must not involve the unnecessary and wanton infliction of pain.  *Furman v. Georgia,* supra, 408 U.S., at 392–393, 92 S.Ct., at 2805–2806 (Burger, C. J., dissenting). See *Wilkerson v. Utah,* 99 U.S. [130], at 136 [25 L.Ed. 345]; *Weems v. United States,* 217 U.S. [349], at 381, 30 S.Ct. [544], at 554 [54 L.Ed. 793].  Second, the punishment must not be grossly out of proportion to the severity of the crime.  *Trop v. Dulles,* supra, 356 U.S., at 100, 78 S.Ct., at 597 (plurality opinion) (dictum); *Weems v. United States, supra,* 217 U.S. at 367, 30 S.Ct. at 549." *Gregg v. Georgia, supra,* 428 U.S. at 173, 96 S.Ct. at 2925.

12.   "Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity.  We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved.  And a heavy burden rests on those who would attack the judgment of the representatives of the people.

This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards.  '[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.' *Furman v. Georgia,* 408 U.S., at 383, 92 S.Ct. [2726], at 2800 (Burger, C. J., dissenting).  The deference we owe to the decisions of the state legislatures under our federal system, id., at 465–470, 92 S.Ct. [2726], at 2842–2844 (Rehnquist, J., dissenting), is enhanced where the specification of punishments is concerned, for 'these are peculiarly questions of legislative policy.' *Gore v. United States,* 357 U.S. 386, 393, 78 S.Ct. 1280, 1285, 2 L.Ed.2d 1405 (1958).  Cf. *Robinson v. California,* 370 U.S. [660], at 664–665, 82 S.Ct. [1417], at 1419–1420 [8 L.Ed.2d 758]; *Trop v. Dulles,* 356 U.S., at 103, 78 S.Ct., at 599 (plurality opinion); *In re Kemmler,* 136 U.S. [436], at 447, 10 S.Ct. [930], at 933 [34 L.Ed. 519]. Caution is necessary lest this Court become, 'under the aegis of the Cruel and Unusual Punishment Clause, the ultimate arbiter of the standards of criminal responsibility . . . throughout the country.' *Powell v. Texas,* 392 U.S. 514, 533, 88 S.Ct. 2145, 2154, 20 L.Ed.2d 1254 (1968).  A decision that a given punishment is impermissible under the Eighth Amendment cannot be reversed short of a constitutional amendment.  The ability of the people to express their preference through the normal democratic processes,

"We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it." *Gregg v. Georgia, supra* at 187, 96 S.Ct. at 2932.

In considering the procedure to be followed in reaching the decision of life or death, the "plurality" has perceived the mandates of *Furman* to require that the sentencing scheme must be so designed as to avoid "a substantial risk that it [the death sentence] would be inflicted in an arbitrary and capricious manner."

"*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia, supra* at 189, 96 S.Ct. at 2932.

The "plurality" has determined that the information necessary to be supplied to a jury to permit it to properly consider such a decision must include facts relating to "the circumstances of the offense together with the character and propensities of the offender." *Gregg v. Georgia, supra.* The "plurality" also requires that the sentencing scheme must make some effort to provide the jury with guidance regarding these factors about the crime and the offender.

"While some have suggested that standards to guide a capital jury's sentencing deliberations are impossible to formulate, the fact is that such standards have been developed. When the drafters of the Model Penal Code faced this problem, they concluded 'that it is within the realm of possibility to point to the main circumstances of aggravation and of mitigation that should be weighed, and weighed against each other, when they are presented

as well as through ballot referenda, is shut off. Revisions cannot be made in the light of further experience. See *Furman v. Georgia, supra,* 408 U.S., at 461–462, 92 S.Ct., at 2839–2840 (Powell, J., dissenting)." *Gregg v. Georgia, supra,* 428 U.S. at 175–76, 96 S.Ct. at 2926.

in a concrete case.' Model Penal Code § 201.6, Comment 3, p. 71 (Tent. Draft No. 9, 1959) (emphasis original). While such standards are by necessity somewhat general, they do provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary. Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner." (Footnotes omitted). *Gregg v. Georgia, supra* at 193–95, 96 S.Ct. at 2934.

In determining whether the procedure itself is a fair one, the "plurality" has given its imprimatur to schemes that allow the sentencing decision to be made by a jury. They do however strongly indicate that where the jury is to be entrusted with the sentencing decision, a bifurcated procedure should be employed.

"Jury sentencing has been considered desirable in capital cases in order to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.' But it creates special problems. Much of the information that is relevant to the sentencing decision may have no relevance to the question of guilt, or may even be extremely prejudicial to a fair determination of that question. This problem, however, is scarcely insurmountable. Those who have studied the question suggest that a bifurcated procedure—one in which the question of sentence is not considered until the determination of guilt has been made—is the best answer." *Gregg v. Georgia, supra* at 190–91, 96 S.Ct. at 2933.

The "plurality" has also looked favorably on attempts to narrow the class of murders subject to the extreme sanction and also provisions for expedited appellate review. *Gregg v. Georgia, supra.* Although expressing a strong preference for individualized sentences rather than mandatory ones,

*Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Harry Roberts v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977); *Green v. Oklahoma,* 428 U.S. 907, 96 S.Ct. 3216, 49 L.Ed.2d 1214 (1976); *Sparks v. North Carolina,* 428 U.S. 905, 96 S.Ct. 3213, 49 L.Ed.2d 1212 (1976), there is a suggestion that the "plurality" might find acceptable a narrowly-defined category of offenders where mandatory sentences might not be offensive.[13]

Analyzing the Pennsylvania scheme in view of the considerations and factors deemed important by the plurality, we must begin with the presumption that the legislative enactment is to be accorded the presumption of constitutionality and that those challenging the statutory scheme must bear a heavy burden. *Gregg v. Georgia, supra,* 428 U.S. at 175, 96 S.Ct. 2909. We are also obligated to follow the statutory law of this jurisdiction which requires an interpretation of legislative intent to be, wherever possible, consistent with the Constitution of the United States as well as the Constitution of this Commonwealth. 1 Pa.C.S.A. § 1922(3) (Supp. 1977–78).

**13.** One possible exception noted by the "plurality" appears to be a mandatory death penalty statute limited to an extremely narrow category of homicide such as murder by a prisoner serving a life sentence. *See Woodson v. North Carolina,* 428 U.S. 280, 286, n. 7, 292, n. 25, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). In *Woodson,* the "plurality" suggested that where the accused is serving a life sentence at the time of the killing that fact *alone* might provide sufficient insight as to the character of the offender to meet their concept of the Eighth and Fourteenth Amendments' mandate in this regard. *Id.* at 286, n. 7, 96 S.Ct. 2978. Also significant in this context is the following observation which appears in the "plurality's" opinion in *Gregg.*

"And there are some categories of murder, such as murder by a life prisoner, where other sanctions may not be adequate." *Gregg v. Georgia, supra,* 428 U.S. at 186, 96 S.Ct. at 2931.

The appellee in the appeal presently before us has not only been sentenced to seven consecutive life sentences, but also the crime was committed while he was confined under maximum security. It is therefore difficult to postulate a factual situation more compelling than the facts before us in this appeal where another life sentence would be more inadequate.

Turning to the first maxim that a penalty must not be "excessive", it is apparent that section 1311 satisfies this requirement. The Pennsylvania legislature has limited the imposition of capital punishment to convictions of murder in the first degree, § 1311(b), which in this jurisdiction is confined to killings "committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate, and premeditated killing." 18 Pa.C.S.A. § 2502(a) (1972). The "plurality" has given its approval to the application of the death penalty to broader definitions of murder, e. g., felony-murder. *Gregg v. Georgia, supra; Proffitt v. Florida, supra; Jurek v. Texas, supra.* In fact, under the Pennsylvania scheme, which limits the type of murder which may be punished by death to a deliberate taking of life, there is compliance with the express language of the "plurality" in *Gregg.*

> ". . . when a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime. It is an extreme sanction, suitable to the most extreme of crimes." *Gregg v. Georgia, supra,* 428 U.S. at 187, 96 S.Ct. at 2932.

Thus, under the guidelines that have been articulated by the "plurality" it is clear that the Pennsylvania scheme provides a punishment which is not "grossly out of proportion to the severity of the crime." To the contrary, it fits neatly within the perimeters that have been found to be acceptable by the plurality.[14]

Regarding the Court's concern with avoiding unbridled discretion on the part of the jury, the Pennsylvania legislature has provided safeguards designed to prevent the risk of such arbitrary action. Section 1311(c) provides for a mandatory consideration by the jury of aggravating and mitigating circumstances in determining whether to impose the death penalty. The circumstances listed in the statute, § 1311(d), provide the "direction" and "limitation" for the

14. As of the writing of this opinion, the "plurality" has yet to express a view on the acceptable manner of the imposition of the death sanction. It can only be assumed that the traditional methods of execution will not be found to be constitutionally prohibited.

jury that *Furman* and *Gregg* required "to minimize the risk of wholly arbitrary and capricious action."

A somewhat comparable scheme of aggravating and mitigating circumstances was approved in *Proffitt v. Florida, supra.* It is significant that under the Pennsylvania scheme the possibility of arbitrary action is further minimized by the requirement that the imposition of death is mandatory where one or more of the statutorily enumerated aggravating circumstances is present and there is an absence of any of the mitigating factors. On the other hand, under the Pennsylvania scheme, where there is a finding of one of the mitigating circumstances or a finding that none of the aggravating circumstances are present, then the sentence must be life imprisonment. In contrast, the Florida statute permits the jury to weigh the competing factors without providing any specific weight to be given to the various factors. Thus, the Pennsylvania scheme clearly provides a more controlled exercise of the sentencing discretion.

Finally, the plurality has expressed certain preferences concerning the sentencing procedure itself. The Pennsylvania procedure strongly approximates the procedures upheld in *Gregg, Proffitt* and *Jurek.* The Pennsylvania statute, like the Georgia, Florida and Texas statutes, provides for a bifurcated proceeding, § 1311(c); and it provides for the automatic expedited appellate review, § 1311(g).[14a]

## V.

The conclusion by the majority of this Court and the court en banc that section 1311 did not comport with constitutional standards is premised upon the belief that the section fails to provide for the dissemination of sufficient information relating to the character and background of the offender to the jury. In my judgment, this position can only be supported by an unwarranted, restrictive reading of the language of section 1311. Further, such a construction ignores

14a. The Pennsylvania statute also places the sentencing decision with the jury where the determination of guilt was made by the jury, a procedure which was approved in *Gregg, supra.*

our responsibility to interpret legislative enactments so that their terms comply with constitutional directives. 1 Pa.C. S.A. § 1922(3) (Supp.1977–78). Even more grievous is the fact that the construction urged by the majority produces a result that is at variance with the long-standing sentencing policies in this jurisdiction.

The United States Supreme Court in ruling upon the death penalty statutes that have been promulgated since *Furman*, has properly considered the terms of those enactments in light of the construction placed upon them by the State's highest court. *Gregg v. Georgia, supra*, 428 U.S. at 201–202, 96 S.Ct. 2909; *Proffitt v. Florida, supra*, 428 U.S. at 255–256, 96 S.Ct. 2960; *Jurek v. Texas, supra*, 428 U.S. at 272, 96 S.Ct. 2950. It is my judgment that the language of section 1311 properly construed by this Court would clearly meet constitutional muster.

It has been the long settled law of this jurisdiction that even in non-capital cases a consideration of the defendant's background and character is an important element in the sentencing decision. *Commonwealth v. Martin*, 466 Pa. 118, 351 A.2d 650 (1976).[15] Even prior to *Furman*, we held in capital cases that a trial court abused its discretion when it imposed the death penalty solely on the basis of the criminal act. *Commonwealth v. Green*, 396 Pa. 137, 151 A.2d 241 (1951). At that early stage our cases made it clear that it was improper to fail to consider the character of the convicted individual and to make inquiry as to the existence of any extenuating or mitigating circumstances. *Commonwealth v. Green, supra*. *See also, Commonwealth v. Garramone*, 307 Pa. 507, 515, 161 A. 733, 737 (1932); *Commonwealth v. Irelan*, 341 Pa. 43, 47, 17 A.2d 897, 898–99 (1941). In *Commonwealth v. Green, supra*, this Court stated:

"The imposition of the death penalty by a judicial tribunal should be made only when it is the sole penalty justified both by the criminal act and the criminal himself and then

---

**15.** Although this writer dissenting in *Commonwealth v. Martin*, 466 Pa. 118, 136, 351 A.2d 650, 659 (1976), my disagreement was not related to the law as it was expressed by the majority in that opinion, but rather its application to the facts then before the Court.

only after a full and exhaustive inquiry into both the criminal act and the criminal himself. Time and again in referring to the duty of juries in fixing the penalty between death and life imprisonment we have insisted that the jury exercise its discretion only after it has considered *all* the evidence, culpatory and exculpatory, incriminating and extenuating, including what manner of man the criminal is and has been: *Com. v. Wooding*, 355 Pa. 555, 557, 50 A.2d 328; *Com. v. Stabinsky*, 313 Pa. 231, 237, 238, 169 A. 439; *Com. v. Dague*, 302 Pa. 13, 15, 152 A. 839; *Com. v. Bentley*, 287 Pa. 539, 135 A. 310. The same rule binds a court sitting without a jury to determine the penalty for murder of the first degree." *Id.* 396 Pa. at 148, 151 A.2d at 247.

In addition to the Pennsylvania case law, the legislature of this State since early in the twentieth century has embraced the concept of indeterminate and individualized sentencing. First, this State required sentencing of minimum to maximum terms of imprisonment. Act of June 19, 1911, P.L. 1055, § 6, as amended, 19 P.S. § 1057 (1964). Then the legislature reinforced this provision by allowing suspension of sentence and probation, at the court's discretion, in all but the most serious crimes. Act of June 19, 1911, P.L. 1055, § 1, as amended, 19 P.S. § 1051 (1964). Following that, the sentencing court was conferred with the power to run sentences consecutively or concurrently. Act of May 28, 1937, P.L. 1036, § 1. Finally, the legislature gave the trial court the power to order a pre-sentence report and a psychiatric and diagnostic examination of the defendant to determine the appropriate disposition. Act of March 31, 1860, P.L. 427, § 73.1. Most recently, the legislature codified their philosophy of individual sentencing in requiring courts to "call for the minimum amount of confinement that is consistent with the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant." 18 Pa.C.S.A. § 1321(b) (Supp.1977–78). *See generally Commonwealth v. Martin, supra.*

To ignore this abundant evidence of a firmly established principle of sentencing in our construction of the instant section is totally unsupportable. This is particularly true in light of the fact that section 1311 is a part of the sentencing code which has expressly reaffirmed its adherence to the philosophy of individualized sentencing. 18 Pa.C.S.A. § 1321(b) (Supp.1977–78). To justify an interpretation of section 1311 which would reject individualized sentencing would require clear and unambiguous language in the enactment under scrutiny evidencing such an intention. Such is clearly not the case here.

The majority opinion and court en banc focuses upon section 1311(d)(2)(i), regarding the age, lack of maturity and youth of the defendant, in finding the statute unconstitutional. By improperly focusing upon the clause "at the time of the killing" the majority argues that the section excludes a sufficient consideration of the total character of the accused. The spirit of the Pennsylvania case and statutory law require a different result as the term "lack of maturity" is easily susceptible to a broad interpretation so as to encompass considerations of the defendant's character and background. The term "maturity" is defined by Webster's Third New International Dictionary, as having attained the normal peak of natural growth and development.[16] In order to determine what stage of development an individual has reached, there would necessarily have to be an examination of all of the factors influencing the developmental process. Relevant to this analysis is the individual's home life including whether he emerges from affluent or deprived circumstances, the number of parents he was raised by and the quality of the rearing, the environment of the neighborhood in which he was raised, his emotional and psychological makeup, his educational exposure, whether or not he has had any military experience, his past criminal offenses, if any, including both adult and juvenile convictions, his religious training or lack of it, and any medical or cosmetic infirmities

16. "Words and phrases shall be construed according to rules of grammar and according to their common and approved usage." 1 Pa.C.S.A. § 1903(a) (Supp.1977–78).

that might reflect on his maturity. Therefore, all of the constitutionally required considerations are implicit in the definition of "lack of maturity."

Additionally, "age" "youth" and "maturity" cannot all be construed to have the same meaning. "Lack of maturity" must have some relevance beyond merely chronological age for it is a well-established rule of statutory construction in this jurisdiction that the General Assembly intends all of the statutory provisions to be effective and certain, 1 Pa.C.S.A. § 1922(2) (Supp.1977–78) and the legislature cannot be deemed to intend any language of a statute to be superfluous and without import. *Consumers Education and Protective Association v. Nolan*, 470 Pa. 372, 368 A.2d 675 (1977).

The "plurality" of the United States Supreme Court in *Jurek v. Texas, supra*, was willing to find the Texas death penalty statute to be broad enough to encompass the defendant's character. The death penalty statute in Texas, Tex. Code Crim.Proc., Art. 37.071 (Supp.1975–76), requires the jury to answer three questions subsequent to a verdict of guilty of one of their enumerated capital homicides.[17] A positive answer to all three questions will result in the imposition of the death penalty. The constitutionality of this procedure turned on whether the questions allow consideration of particularized mitigating factors. The Court found that question two, concerning the probability of the defendant committing further acts of violence, allows a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show, because the Texas Court of Criminal Appeals indicated that it would

---

17. "(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

"(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Art. 37.071(b) (Supp.1975–1976).

interpret question two to that effect. Likewise, if the Pennsylvania Supreme Court would interpret "lack of maturity," as it should, to encompass the consideration of the defendant's character and background, section 1311 would also be constitutionally sound.

Even accepting the narrow interpretation of the majority opinion and the court en banc, the United States Supreme Court has struck down only the mandatory death penalty statutes lacking *any* consideration of mitigating factors. *Woodson v. North Carolina, supra; Roberts v. Louisiana, supra; Harry Roberts v. Louisiana, supra.* This suggests that perhaps only a complete foreclosure of the introduction of any mitigating circumstances would render a death penalty statute unconstitutional. This possibility is further supported by the suggestion of the "plurality" that a mandatory death penalty statute which is limited to the narrow category of murder by a prisoner serving a life sentence may be valid. *See Woodson v. North Carolina, supra,* 428 U.S. at 286, n. 7, 292, n. 25, 96 S.Ct. 2978.

## VI.

In conclusion it is my view that the Pennsylvania statutory scheme for the imposition of the death sanction in murder cases when fairly read is fully in accord with the announced philosophy of the "plurality" of the Supreme Court. To reach a contrary conclusion the majority has strained and tortured the unambiguous language of section 1311. It is particularly regrettable that my brethren chose to express their apparent misguided sympathy for the instant appellee. Even under the furthest stretch of the imagination a credible theory cannot be propounded to support the view that the imposition of the death penalty for this offender would be repulsive to "the evolving standard of decency." I feel that the majority's attempt to find a basis for giving relief on a facial attack upon the section is equally as untenable.