**Stanton T. STORY, Appellant,**

v.

**Warden Tom KINDT; Attorney General Preate.**

**No. 92–3586.**

United States Court of Appeals, Third Circuit.

Argued Feb. 15, 1994.

Decided May 27, 1994.

---

See also: 476 Pa. 391, 383 A.2d 155, and 497 Pa. 273, 440 A.2d 488.

Thomas S. White, Federal Public Defender, W. Penn Hackney, First Asst. Federal Public Defender, Michael D. Bartko (argued), Asst. Federal Public Defender, Pittsburgh, PA, for appellant.

Robert E. Colville, Dist. Atty., Kemal Alexander Mericli, Asst. Dist. Atty., Thomas N. Farrell (argued), Asst. Dist. Atty., Pittsburgh, PA, for appellees.

Before: BECKER, HUTCHINSON and COWEN, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal by Stanton T. Story from an order of the United States District Court for the Western District of Pennsylvania denying his petition for a writ of habeas corpus on the ground that he had failed to exhaust available state court remedies. Story contends that we must excuse the exhaustion requirement because the nine-year delay in his post-conviction collateral proceedings in the Court of Common Pleas of Allegheny County was inordinate. We agree. We therefore reverse the order of the district court and remand the case for consideration of Story's habeas petition on the merits. In doing so we note that it seems likely that Story would not have suffered this delay had the Court of Common Pleas maintained a central docket sheet for each criminal case rather than a system which merely lists en-

tries in the order of their filing. This method makes it difficult to determine whether or when a particular order was filed, and we urge that the Court remedy the deficiency so as to avoid similar delays in the future.

## I. PROCEDURAL HISTORY

### A. *The Underlying Conviction*

In October 1979, Story was convicted for the first degree murder of Police Officer Patrick Wallace and sentenced to death. Story appealed his conviction and sentence to the Supreme Court of Pennsylvania, which affirmed the judgment of conviction but vacated the death sentence and imposed a sentence of life imprisonment. *Commonwealth v. Story*, 497 Pa. 273, 440 A.2d 488 (1981).[1]

### B. *State Collateral Proceedings*

In July 1983, Story, acting pro se, sought post conviction collateral relief in the Court of Common Pleas of Allegheny County pursuant to Pennsylvania's Post Conviction Hearing Act ("PCHA"), 42 Pa.C.S. §§ 9501–9543.[2] The Court appointed Jack Conflenti of the Allegheny County Public Defender's Office to represent him. Although ordered to file an amended petition on Story's behalf, Conflenti failed to do so. As a result, on February 10, 1984, the pro se petition was denied without a hearing.

Story appealed the denial of PCHA relief to the Superior Court of Pennsylvania. On April 19, 1985, that court vacated the trial court's judgment and remanded the matter for appointment of new counsel and other necessary proceedings. On June 5, 1985, the Court of Common Pleas appointed George C. Entenman to pursue Story's collateral claims by filing an amended PCHA petition. According to Story, he attempted to contact Entenman on several occasions to urge the filing of an amended petition, and even sent family members to Entenman's office for the same purpose, but Entenman failed to comply with the Court's order.

Nearly eleven years after Conflenti failed to file an amended petition, and nearly nine years after Entenman failed to act as well, Story's PCHA petition remains in the Court of Common Pleas. The only activity on Story's petition since June 5, 1985, has been the recent appointment of his third PCHA attorney (Jerome DeRiso) on February 24, 1993, and the filing of an amended petition a year later on February 14, 1994.

### C. *The Federal Habeas Proceedings*

In February 1992, Story filed a pro se petition for a writ of habeas corpus, 28 U.S.C. § 2254, which eventually reached the District Court for the Western District of Pennsylvania.[3] In addition to raising three substantive claims,[4] Story's habeas petition related his inability to contact Entenman and his frustration that, after several years, there had been no disposition on his PCHA petition. The Commonwealth filed a response in which it asserted that the habeas petition

---

1. Story was indicted in November of 1974. In March 1975, a jury found him guilty of murder in the first degree and fixed his sentence at death. On direct appeal, the Supreme Court of Pennsylvania reversed the conviction and remanded the case for a new trial. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155, 169 (1978). The death penalty statute under which Story had initially been sentenced in 1975 was declared unconstitutional in 1977 in *Commonwealth v. Moody*, 476 Pa. 223, 382 A.2d 442, 443 (1977). Thereafter, in September of 1978, Pennsylvania enacted a new death penalty statute. The Supreme Court ultimately determined that Story's second death sentence could not stand, having been based on a statute not in existence at the time of the crime. *Story*, 440 A.2d at 489–91.

2. The PCHA was amended in 1988, and is now known as the Post Conviction Relief Act ("PCRA"). *See* 42 Pa.C.S. § 9541.

3. Story had been transferred to a federal penitentiary in Indiana, apparently pursuant to a federal-state agreement for housing of prisoners, and he initially filed the petition in December, 1991 in the United States District Court for the Southern District of Indiana. On December 31, 1991, the Indiana federal district court transferred the case to the United States District Court for the Eastern District of Pennsylvania which, on February 12, 1992, transferred the case to the United States District Court for the Western District of Pennsylvania (by that time Story had been re-transferred to a Pennsylvania state prison).

4. These are: 1) ineffective assistance of counsel at trial; 2) unconstitutional selection of a death qualified jury; and 3) error by the Supreme Court of Pennsylvania in imposing a life sentence rather than remanding the case for resentencing.

should be denied for failure to exhaust all claims therein or, in any event, because the claims were without merit.

The matter was referred to a magistrate judge who, despite Story's revelations of state court delay, recommended that the district court dismiss the petition for failure to exhaust state court remedies.[5] Story filed objections, in which he again asserted that, under the circumstances, the state process was ineffective to protect his rights, and that, in accord with 28 U.S.C. § 2254(b),[6] it would be futile to require him to exhaust his state remedies. By order entered September 17, 1992, the district court adopted the magistrate judge's Report and Recommendation, dismissed the petition, and denied Story's request for the issuance of a certificate of probable cause.

■ Story timely appealed, again seeking the issuance of a certificate of probable cause. A motions panel of this Court found probable cause to appeal and issued the certificate on May 28, 1993.[7] Since this is an appeal from a final order dismissing Story's pro se petition for writ of habeas corpus, we have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the district court's determination that state remedies have not been exhausted and should not be excused. *Hankins v. Fulcomer*, 941 F.2d 246, 249 (3d Cir.1991).

## II. EXHAUSTION OF STATE REMEDIES

■ Generally, a state prisoner seeking federal habeas relief must present each of his claims to the state's highest court. *See Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971); *Rose v. Lundy*, 455 U.S. 509, 515, 102 S.Ct. 1198, 1201, 71 L.Ed.2d 379 (1982). However, exhaustion is not jurisdictional, but a matter of comity. *See Id.*, 455 U.S. at 515, 102 S.Ct. at 1201. The federal courts need not defer to the state judicial process when no appropriate remedy exists at the state level or when the state process would frustrate the use of an available remedy. *See* 28 U.S.C. § 2254(b); *Hankins*, 941 F.2d at 249.

■ We observed in *Wojtczak v. Fulcomer*, 800 F.2d 353, 354 (3d Cir.1986) that "inexcusable or inordinate delay by the state in processing claims for relief may render the state remedy effectively unavailable," thereby prompting the federal court to excuse exhaustion. Although the existence of an inordinate delay does not automatically excuse exhaustion, it does shift the burden to the state to demonstrate why exhaustion should still be required—a burden that is difficult to meet. *See Burkett v. Cunningham*, 826 F.2d 1208, 1218 (3d Cir.1987), *cert. denied*, —— U.S. ——, 112 S.Ct. 3055, 120 L.Ed.2d 921 (1992); *Wojtczak*, 800 F.2d at 355.

In *Wojtczak*, for example, we dealt with a 33-month delay in deciding post-conviction petition, finding it sufficient to excuse exhaustion. *Id.* at 356. We have also found delays of eleven, five, twelve and three years sufficient to excuse exhaustion. *See Hankins*, 941 F.2d at 247 (eleven years to decide motion to withdraw guilty plea sufficient to excuse exhaustion requirement); *Burkett*, 826 F.2d at 1218 (five year delay sufficient to excuse exhaustion); *Codispoti v. Howard*, 589 F.2d 135, 142 (3d Cir.1978) (twelve years to decide new trial motion); *United States ex rel. Senk v. Brierley*, 471 F.2d 657, 660 (3d Cir.1973) (three year delay in deciding

---

**5.** Specifically, the Magistrate Judge's Report and Recommendation found that only Story's second claim (improperly impaneled jury) had been exhausted, thereby rendering the habeas petition a "mixed petition" which required dismissal. *See Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982) (district court must dismiss a habeas petition containing both exhausted and unexhausted claims which raise a colorable claim of denial of a federal right).

**6.** 28 U.S.C. § 2254(b) provides:

(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

**7.** Pursuant to our issuance of the certificate, the Clerk of this Court appointed the Federal Public Defender's Office to represent Story on appeal.

PCHA petition); *see also United States ex rel. Geisler v. Walters,* 510 F.2d 887, 893 (3d Cir.1975) (stating in dicta that three years and four months to decide motion for new trial was inordinate delay sufficient to obviate the exhaustion requirement).

■ Story has demonstrated, and the Commonwealth has not denied, that he has suffered significant delay at the hands of the Court of Common Pleas for Allegheny County. The Commonwealth maintains, however, that its interest in deciding in the first instance issues raised concerning the prosecution of an alleged murderer, especially one who killed a state law enforcement officer, outweighs any delay he has suffered. The Commonwealth also claims that any delay was due to Story's own failure to alert the Court of Common Pleas that the court had not yet ruled on his PCHA petition.[8] Finally, the Commonwealth points to the recent progress on Story's PCHA petition, and urges this Court to defer to the state process.

We find the facts in this case to be as egregious as those in the cases cited above. During the nearly eleven years of his PCHA proceedings, Story has had three court-appointed attorneys, two who failed to comply with a Court of Common Pleas order to file an amended petition on Story's behalf, and one (the most recent) who took nearly a year to comply with a similar order. More importantly, however, the Court of Common Pleas neglected Story's case for almost eight years, apparently because of what appears to be seriously deficient docket management procedures, *see infra,* taking action only after it received notice of Story's federal petition.

We find it wholly untenable to penalize Story for his attorneys' failures and the Court of Common Pleas' inability to manage its own docket. Nor do we consider recent progress on Story's PCHA petition sufficient to require him to afford the state's courts three more years,[9] in addition to the nearly nine already consumed.[10] The Commonwealth simply has not met its burden to show why, in light of its inordinate and inexcusable delay, we should not excuse exhaustion. We will therefore reverse the order dismissing the habeas petition and remand the case to the district court with directions to entertain Story's petition on the merits.

## III. THE ALLEGHENY COUNTY DOCKETING SYSTEM

When we searched for some reasonable explanation for the Court's failure to act on Story's PCHA petition for such a lengthy period of time, we concluded that the monumental delay was, in large part, the result of serious deficiencies in the Court's docketing system. For some reason, the Court of Common Pleas of Allegheny County maintains no running (contemporaneous) central docket sheets for work in process on any criminal case before it.

Before 1978, court personnel apparently recorded all filings and orders from all cases in a series of ledgers. The ledger entries appeared in chronological order of their happening. However, on any given day, the ledgers might have reflected several unrelated occurrences in several unrelated cases. Thus, it was nearly impossible for someone, including the court, to array in one place the proceedings of any particular case without expending considerable effort rummaging

---

8. The Commonwealth contends, among other things, that Story should have filed another pro se petition in the Court of Common Pleas for Allegheny County. To the extent that his several previous encounters with appointed counsel and the court proved futile, however, we find Story's failure to pursue a new petition quite understandable. After all, " 'it is the legal issues that are to be exhausted, not the petitioner.' " *Burkett,* 826 F.2d at 1218 (quoting *Walters,* 510 F.2d at 893).

9. Three years is the amount of time counsel estimated at oral argument that it would take to

complete the state proceedings, including an appeal to the Pennsylvania Superior Court and resolution of a petition for allocatur to the Pennsylvania Supreme Court.

10. *See Burkett,* 826 F.2d at 1218 & n. 31 (excusing exhaustion upon finding that petitioner's claims had been delayed long enough, regardless of the fact that state court proceedings had shown recent advancement); *Wojtczak,* 800 F.2d at 356 & n. 3 (excusing exhaustion because of delay even where cause of delay had been remedied).

through each page of the ledgers. Although the court computerized the ledger system in 1978, computerization did not remedy the problem; the court still does not create a running central docket sheet for each criminal case until the case is appealed to the Superior Court of Pennsylvania, and so there is no convenient source which reflects the filings that have occurred in a particular case.

As a result of this system, there was never a public record created to summarize the events in Story's collateral proceeding. Nor was there a convenient method by which the presiding judge could monitor the progress of Story's case, independent of the judge's own recordkeeping. There was simply no way of knowing the status of a case without scanning the computer files by entering the defendant's name, state offense tracking number (OTN), or the information (docket) number. The cumbersome nature of these methods apparently caused the court to overlook Story's pending proceeding.

We are surprised that a court with such a distinguished history as the Court of Common Pleas of Allegheny County lacks a central docket sheet system capable of monitoring work in progress on each criminal case. We believe that the absence of such a system contributed to ,the terrible delay of nearly nine years that we observe here.[11] We urge the Court of Common Pleas to upgrade its docketing system.

The order of the district court dismissing Story's federal habeas petition will be reversed and the case remanded to the district court for consideration of the petition on the merits.[12]

---

**11.** It also created a good deal of confusion in the proceedings before this Court because neither party could state with any certainty whether the Court of Common Pleas ever appointed attorney Entenman to represent Story.

**12.** We do not engage the dissent's discussion of the merits, and intimate no view as to its correctness *vel non* except to note that we do not believe the dissent's analysis and conclusion to be free from doubt. At all events, we believe it preferable for the merits to be addressed by the district court in the first instance.

COWEN, Circuit Judge, dissenting.

I agree with the majority that the inordinate delay in this case operates to excuse the exhaustion requirement, and join the opinion of the court to this extent. However, I cannot join in the judgment of the court to remand the case for the district court to address the merits of the petition. I believe once the exhaustion requirement is excused, we should also proceed to address the merits of the petition to the extent possible, particularly where, as here, our decision on any one issue would be dispositive of the petition. Petitioner Story argues, *inter alia,* that the state selected a death-qualified jury[1] to try him when, in fact, he was not eligible for capital punishment, thereby violating his Sixth Amendment right to be tried by an impartial jury. This is strictly a legal question which has been briefed and argued before us. We need no further information in order to adjudicate the matter. I would proceed to decide the question in favor of Story, and grant the petition conditioned on Story's not being retried before a non-death-qualified jury within a reasonable period of time. This would render his remaining claims moot.

The majority contends that it is preferable for the district court to address the merits in the first instance. Maj.Op. at 407 n. 12. I respectfully disagree. As a general matter, a court of appeals does not remand purely legal questions to the district court for the sole purpose of having the district court address the question in the first instance. We are as competent as the district courts in resolving purely legal questions and thus do not need to remand with respect to such questions, although we almost invariably re-

---

**1.** We previously explained the nature of such a jury:

"Death qualification" refers to the exclusion of "the so-called *'Witherspoon*-excludable[s]' " from a jury panel. *"Witherspoon*-excludable," in turn, refers to a prospective juror whose conscientious or religious scruples toward the imposition of the death penalty would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "

*United States v. Salamone,* 800 F.2d 1216, 1219 n. 6 (3d Cir.1986) (citations omitted).

mand cases to the district courts for resolution factual disputes. Moreover, we do not exercise discretionary review powers as the Supreme Court does; we adjudicate appeals presented to us as a matter of right by the appellants who are entitled to a decision. The nature of our authority carries with it a duty to adjudicate all matters as justice requires. We should not pick and choose among the questions properly presented to us when any of those questions is dispositive of an appeal. Finally, a remand in this case adds delay to the long delay which the majority describes as "inordinate." Maj.Op. at 403. Story's quest for post-conviction relief has already been a lengthy and tortuous process of 15 years since he was convicted for the second time in October 1979. Remanding the case to the district court likely will add another two or three years to the saga of delay before this case resurfaces to our court because it will take time for the district court to schedule and to conduct a hearing on the ineffective assistance claim, and for us to process any future appeals including the issuance of a certificate of probable cause. The district court might also be wasting its time in holding a hearing on the ineffective assistance claim if my analysis is accepted when the case comes up on appeal again. All this trouble is not necessary if the majority agrees with my analysis here. If one can find an example for the truism that "justice delayed is justice denied," the majority's disposition today is one.

### I.

Story was tried and convicted in 1975 for first degree murder allegedly committed in July of 1974. He was sentenced to death. While his first appeal was pending, the death penalty statute pursuant to which he was sentenced to death was declared unconstitu-

tional. *Commonwealth v. Moody*, 476 Pa. 223, 382 A.2d 442 (1977), *cert. denied*, 438 U.S. 914, 98 S.Ct. 3143, 57 L.Ed.2d 1160 (1978). Story's conviction was reversed and he was granted a new trial because of the admission of improper and prejudicial evidence. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978).

Before Story's retrial, the Pennsylvania legislature enacted a new death penalty statute, the Act of September 13, 1978 ("1978 Act"). There is a standing legislative mandate in Pennsylvania that "no statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 Pa.Cons.Stat.Ann. § 1926 (Purdon Supp.1993). The 1978 Act does not "clearly and manifestly" state that it was to be applied retroactively. Section 2 of the 1978 Act states that "[t]his act shall take effect immediately." This section indicates that the Act was to apply prospectively. The same "[t]his Act shall take effect immediately" language in another death penalty statute had been interpreted in January of 1978 by the Pennsylvania Supreme Court as indicating that the statute was meant to apply only prospectively, not retroactively to conduct which took place before the enactment of the statute. *Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174, 180 n. 13 (1978) (interpreting Act of 1974, March 26, P.L. 213, No. 46, §§ 3, 6). *See also Commonwealth v. Story*, 440 A.2d 488, 489–91 (Pa.1981). Accordingly, it was clear before the second trial that Story was not eligible for capital punishment pursuant to the newly enacted Act of 1978 because he allegedly committed the offense in 1974.[2]

Although Story was not a capital defendant in the second trial, the state informed the state trial court that it intended to seek death penalty for Story, and successfully

---

**2.** This case is different from *Dobbert v. Florida*, 432 U.S. 282, 292–301, 97 S.Ct. 2290, 2298–302, 53 L.Ed.2d 344 (1977), where the Supreme Court held that the Constitution does not forbid a state from retroactively applying a new death sentence statute to a defendant who committed a murder at the time when another death sentence statute was in effect, if such application were the choice of the state. Such was not the choice of Pennsylvania in this case; the Pennsylvania leg-

islature decided to apply its legislation only prospectively. A state court can only constitutionally try a defendant in accordance with the penalty prescribed by the state legislature. *Cf., e.g., McKenna*, 383 A.2d at 183 ("[I]t would be repugnant to any fair system of jurisprudence to knowingly permit a court to impose a sanction (regardless of its nature) that exceeds that tribunal's authority.") (Nix, J., concurring).

sought over the objection of Story a death-qualified jury to retry Story. The state trial court empaneled a death-qualified jury to retry Story in 1979. He was convicted and sentenced to death under the Act of 1978. On direct appeal the Pennsylvania Supreme Court held that the Act of 1978 did not apply to Story's conduct, but did not disturb the conviction; it merely reversed the death sentence and imposed a term of life imprisonment on Story. *Story*, 440 A.2d at 489–92. The Pennsylvania Supreme Court rejected Story's argument relating to the death-qualified jury without discussion. *Id.* at 489 n. 1.

## II.

The Sixth Amendment, applied through the Fourteenth Amendment to the states, *see Duncan v. Louisiana*, 391 U.S. 145, 147–58, 88 S.Ct. 1444, 1446–52, 20 L.Ed.2d 491 (1968), provides in part that "the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State." U.S. Const. amend. VI. In construing the Sixth

Amendment, the Supreme Court has ruled that in a capital case, a capital defendant may be tried before a death-qualified jury, *Lockhart v. McCree*, 476 U.S. 162, 173–85, 106 S.Ct. 1758, 1764–70, 90 L.Ed.2d 137 (1986), and that in joint trials part of which involved a capital crime, non-capital defendants may be tried before a death-qualified jury together with capital defendants, *Buchanan v. Kentucky*, 483 U.S. 402, 414–25, 107 S.Ct. 2906, 2913–19, 97 L.Ed.2d 336 (1987). The case *sub judice* presents the question whether an individual non-capital defendant can be tried alone before a death-qualified jury. This question is markedly different from those presented in *McCree* and *Buchanan*. I would answer that question in the negative.[3]

The "impartial jury" requirement under the Sixth Amendment has spawned a great deal of debate and empirical studies. *See McCree*, 476 U.S. at 167–73, 106 S.Ct. at 1762–64. It is not necessary, however, to define the precise parameters of the impar-

---

**3.** *Teague v. Lane*, 489 U.S. 288, 292–317, 109 S.Ct. 1060, 1065–78, 103 L.Ed.2d 334 (plurality opinion), prevents a federal court from granting habeas corpus relief to a state prisoner based on a new rule announced after the judgment of his conviction and sentence became final, unless that rule falls within the two narrow exceptions to the nonretroactivity principle. However, "a federal court may ... decline to apply *Teague* if the State does not argue it." *Caspari v. Bohlen*, —— U.S. ——, ——, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). In this case, the state did not assert the *Teague* defense either before us or before the district court and, thus, waived it. Accordingly, I need not decide the implication of *Teague*.

In any event, I believe Story's argument that trying a non-capital defendant before a death-qualified jury violated his Sixth Amendment right to a trial before an impartial jury is based on a common sense understanding of the Amendment and the nature of the death qualification process, and is foreshadowed by Supreme Court cases which require compelling or significant interests to justify trying a defendant before a death-qualified jury. There is no need for a novel interpretation. Thus, he is not seeking the benefit of a new rule.

Assuming that Story seeks to rely on a new rule, that rule falls within the second exception to the *Teague* rule because it is a watershed rule "implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle v. Parks*, 494 U.S. 484, 495, 110 S.Ct. 1257, 1263, 108 L.Ed.2d 415 (1990). The proper functioning of the jury occupies an important place in our sys-

tem of justice, and courts have zealously guarded it against unlawful interference. *See, e.g., Sullivan v. Louisiana*, —— U.S. ——, ——, 113 S.Ct. 2078, 2080–2083, 124 L.Ed.2d 182 (1993) (constitutionally defective reasonable doubt instruction cannot be harmless error); *United States v. Pelullo*, 14 F.3d 881, 887–97 (3d Cir. 1994) (collateral estoppel cannot be applied against a criminal defendant to establish an element of a crime). *But see Adams v. Aiken*, 965 F.2d 1306, 1312 (4th Cir.1992) (the rule invalidating constitutionally defective reasonable doubt instruction does not fall within the second exception to the *Teague* nonretroactivity principle), *cert. denied*, —— U.S. ——, 113 S.Ct. 2966, 125 L.Ed.2d 666 (1993), *cert. granted on reh'g and judgment vacated*, —— U.S. ——, 114 S.Ct. 1365, 128 L.Ed.2d 42 (1994) (remanding the case to the Court of Appeals for the Fourth Circuit for reconsideration in light of *Sullivan v. Louisiana*).

The impartiality of the judge and/or trier of facts is a basic component of fair proceeding. *See Tumey v. Ohio*, 273 U.S. 510, 532–34, 47 S.Ct. 437, 444–45, 71 L.Ed. 749 (trial by potentially biased judge violated due process); *Haupt v. Dillard*, 17 F.3d 285, 287–88 (9th Cir.1994). The impartiality of the jury which is the sole trier of facts and the arbiter of guilt in a criminal case, is more fundamental and more important. The selection of a partial jury destroys any pretense of fairness in a proceeding. *See also infra* at 411–12 (non-impartial and biased jury cannot be harmless).

tiality requirement. It suffices to state that sociological studies on death-qualified juries cited in *McCree, id.,* sufficiently demonstrate that death-qualified juries are problematic and not impartial in the true sense of the term. The Supreme Court "assume[d]" that the studies were "both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries." *Id.* at 173, 106 S.Ct. at 1764. In *Buchanan,* the Court again assumed that accumulated scholarly studies demonstrate that death-qualified juries are abnormally prone to convict. 483 U.S. at 415 n. 16, 107 S.Ct. at 2913 n. 16 (citing *McCree* ). The conviction proneness even when infecting only *some* jurors comprising the jury brings into doubt the impartiality of the jury as a whole, not to mention when conviction-proneness *de facto* serves as the sole criterion for the selection of the whole jury, as in the death qualification process. Accordingly, in a non-capital case, without more, death-qualified juries can be presumed not to be impartial juries within the meaning of the Sixth Amendment.

Recognizing the serious problem with a death-qualified jury, the Supreme Court has narrowly permitted such a jury to try a capital defendant, *McCree,* 476 U.S. at 173–85, 106 S.Ct. at 1764–70, and to try a non-capital defendant together with a capital defendant in a joint trial, *Buchanan,* 483 U.S. at 414–25, 107 S.Ct. at 2913–19. The Court was not without difficulty in permitting the use of death-qualified juries even in these limited circumstances. The Court went out of its way to justify the decision in each case by articulating compelling or significant state interests.

According to the Court, the state's decision to have a death-qualified jury try a capital defendant can be justified by two important state interests that such a jury serves: (1) to obtain a single jury that could impartially decide all of the issues in the case (both the guilt phase and sentencing phase), and (2) to allow the defendant to benefit at the sentencing phase of the trial from the jury's "residual doubts" about the evidence presented at the guilt phase. *McCree,* 476 U.S. at 180–81, 106 S.Ct. at 1768–69. Of course, a state has a legitimate interest in not having a juror who is against the death penalty sit on a jury whose duty includes administering the penalty of death. As to non-capital defendants in joint trials with capital defendants, they may be tried before a death-qualified jury because of the strong state interest in having a joint trial.[4] *Buchanan,* 483 U.S. at 418–20, 107 S.Ct. at 2914–16. In a joint trial, the state under *McCree* may empanel a death-qualified jury to try the capital defendant.

These justifications are completely absent in cases such as this where the sole defendant was not eligible for capital punishment. In such a case the Sixth Amendment prohibits the use of a death-qualified jury because there is no valid reason for empaneling such a jury. As Justice Marshall stated in his dissent in *Buchanan,* "[i]t is conceded ... and the Court's analysis today implicitly accepts, that the Sixth Amendment would have prohibited death qualification had petitioner been tried alone." *Buchanan,* 483 U.S. at 430, 107 S.Ct. at 2922 (Marshall, J., dissenting).

The state interests that motivated the holding in both *McCree* and *Buchanan* are not present in this case. By state legislation and case law, Story was ineligible for capital punishment. *See* Part I of this dissent. The state therefore had no legitimate interests that were sanctioned in *McCree.* There was no co-defendant in this case and, therefore, the state cannot resort to the state interest in holding joint trials as articulated in *Buchanan.* Accordingly, the state had no legitimate interest in having Story tried before a death-qualified jury. *See also Middleton,* 244 Cal.Rptr. at 396 ("We do not believe ...

---

4. Indeed, the reliance on the state interest in holding joint trials is not solid. A better alternative is to impanel a separate non-death-qualified jury to try the non-capital defendants simultaneously with the death-qualified jury that tries the capital defendant, as suggested in *California v. Middleton,* 244 Cal.Rptr. 378, 396 (Cal.Ct. App.), *review denied, id.* (1988). Separate juries for different defendants have been employed in California and approved by its Supreme Court. *Id.* n. 25. This approach saves time and money and protects the rights of the defendants. *See Sometimes Two Juries Are Better than One,* N.Y. Times, Dec. 20, 1993, at D9.

that there is any legitimate state interest that should compel the trial of a non-capital defendant over his or her objection (merely because there are other defendants who are subject to capital punishment), by a 'death qualified' jury where some other reasonable alternative short of a severance is available and where such alternative is requested by the non-capital defendant.") (citation omitted).

I am aware of the language of the Supreme Court in *McCree* that "an impartial *jury* consists of nothing more than '*jurors* who will conscientiously apply the law and the find the facts.'" *McCree*, 476 U.S. at 178, 106 S.Ct. at 1767 (citation omitted) (quoted in *Buchanan*, 483 U.S. at 417, 107 S.Ct. at 2914). I note that this language was meant to reject McCree's argument that he was entitled to a balanced jury. *Id.* It was not meant to apply blindly to all situations. The Court itself did not seem to accord too much weight to its intimation. Indeed, if that language states the rule, the Court would not have had to go out of its way to justify the use of death-qualified juries by articulating compelling or significant state interests in *McCree* and *Buchanan*.

More important, if a death-qualified jury can be presumed to be conviction-prone, it is not one that "will conscientiously apply the law and find the facts," *McCree*, 476 U.S. at 178, 106 S.Ct. at 1767, in the true sense of that phrase. To say otherwise is to ignore the realities of life. We should not close our eyes to the demonstrative inability of the conviction-prone, death-qualified jury to impartially decide guilt for the sole goal of adhering to the conclusion that even a conviction-prone jury can *theoretically* apply the law conscientiously. The conviction-proneness of certain jurors disturbs many a jurist. Most recently, Justice O'Connor was persuaded to advocate permitting defendants, but not the state, to exercise peremptory challenges on the basis of gender in order to prevent conviction-prone jurors from sitting on a jury (because women are more likely to convict in certain cases), although she agreed with the Court that the government should not be allowed to do so. *J.E.B. v. Alabama ex rel. T.B.*, —— U.S. ——, ——, 114 S.Ct.

1419, 1430–33, 128 L.Ed.2d 89 (O'Connor, J., concurring). The reason she gave was that constitutional prohibitions against discrimination apply only to state actors, and not to defendants who are private actors. *Id.* If we permit a death-qualified jury to try a non-capital defendant, neither the Constitution nor logic provides a non-arbitrary stopping point. We may have to permit death-qualified juries to try less serious criminal cases. It would be repugnant to our system of justice if, for example, we tried a defendant indicted for third degree criminal assault before a death-qualified jury.

### III.

One may ask whether Story was prejudiced by trial before a death-qualified jury. Most constitutional trial errors are subject to a harmless error analysis. *See generally Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Brecht v. Abrahamson*, —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (habeas case). Some structural errors, however, are not. *Sullivan v. Louisiana*, —— U.S. ——, ——, 113 S.Ct. 2078, 2080–83, 124 L.Ed.2d 182 (1993) (unconstitutional reasonable doubt instruction not subject to harmless error analysis); *but see Kontakis v. Beyer*, 19 F.3d 110, 114–18 (3d Cir.1994) (on habeas petition applying harmless error analysis to instructions that unconstitutionally altered the state's burden to prove that the defendant killed his wife purposely). The case *sub judice* is distinguishable from *Kontakis* because Story's argument is based on the partiality of the jury rather than defective jury instructions.

The Supreme Court has recognized the partiality of the trial judge as a structural defect not amenable to harmless error analysis because such a problem "affect[s] the framework within which the trial proceeds." *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (Rehnquist, C.J., delivering the opinion of the Court) (citing *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927)). Similarly, and perhaps to a greater extent, trying Story before a death-qualified jury, which was required to make the ultimate decision of whether to convict Story, affected the whole

proceeding and defied any attempt to search for fairness in the defective trial process. *Cf. Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) (per curiam) (improper exclusion of jury in capital case constitutes reversible constitutional error per se); *Gray v. Mississippi,* 481 U.S. 648, 659–68, 107 S.Ct. 2045, 2052–57, 95 L.Ed.2d 622 (1987) (reaffirming *Davis;* improper exclusion of juror in capital case not subject to harmless error analysis); *Johnson v. Zerbst,* 304 U.S. 458, 462, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938) ("The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not 'still be done.'" (citation omitted)). Accordingly, trial before a death-qualified jury is a structural error that is not amenable to a harmless error analysis.

### IV.

For the foregoing reasons, I respectfully dissent from the judgment of the court. I would grant the petition conditioned upon Story's not being retried before a non-death-qualified jury within a reasonable time.