In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 21-1704
JAMES A. EVANS,
 Petitioner-Appellant,
 v.

ANTHONY WILLS,
 Respondent-Appellee.
 ____________________

 Appeal from the United States District Court for the
 Southern District of Illinois.
 No. 3:19-cv-1290 — David W. Dugan, Judge.
 ____________________

 ARGUED FEBRUARY 16, 2023 — DECIDED APRIL 27, 2023
 ____________________

 Before RIPPLE, SCUDDER, and ST. EVE, Circuit Judges.
 SCUDDER, Circuit Judge. Following two criminal convic-
tions under Illinois law, James Evans sought postconviction
relief in an Illinois trial court. He did so in 2003. Yet twenty
years later, his petition is still pending. In 2019, and fed up
with the delay, Evans invoked 28 U.S.C. § 2254 and turned to
federal court for relief. As he saw it, Illinois’s postconviction
relief process had proven “ineﬀective,” thereby allowing him
under the terms of § 2254(b)(1) to seek federal habeas relief
2 No. 21-1704

without waiting further for relief in the Illinois courts. We
agree. The delay Evans has experienced of twenty years and
counting is beyond the pale and indefensible. We therefore
vacate the district court’s judgment and remand.
 I
 The federalism principles underpinning the federal ha-
beas statute require state prisoners to exhaust state remedies
before seeking federal postconviction relief. See 28 U.S.C.
§ 2254(b)(1). When a state provides an outlet for postconvic-
tion relief—commonly shorthanded “state habeas” or “state
postconviction review”—a prisoner must go through that
process completely as well. See Lane v. Richards, 957 F.2d 363,
364–65 (7th Cir. 1992).
 But the exhaustion requirement is neither ironclad nor un-
yielding. Congress envisioned circumstances, however rare,
where there may exist “an absence of available State correc-
tive process” or where state remedies prove “ineﬀective to
protect the rights of the applicant.” 28 U.S.C. § 2254(b)(1)(B).
Our case law makes clear that a state-law remedy can become
ineﬀective or unavailable by virtue of delay if the delay is both
inordinate and attributable to the state. See Carter v. Buesgen,
10 F.4th 715, 723–24 (7th Cir. 2021); Lane, 957 F.2d at 364–66.
 Carter is a prime example of recent vintage. Marvin Carter
waited for over four years for Wisconsin courts to rule on the
merits of his direct appeal. See 10 F.4th at 716. We found such
a prolonged delay not only “extreme” but also attributable to
the state: ﬁrst the court clerk’s oﬃce failed to transmit neces-
sary documents for months, and then the public defender’s
oﬃce requested a long series of extensions, each of which the
Wisconsin Court of Appeals granted “in rote fashion.” Id. at
No. 21-1704 3

716, 718. Carter’s experience revealed a “systemic deﬁciency”
in the Wisconsin court’s handling of his case. Id. at 723. Alt-
hough Carter’s counsel had requested extension after exten-
sion, nobody—not the public defender’s oﬃce, not the courts,
not the attorney general, not anybody else—intervened. See
id. at 723–24. On those facts, we had no diﬃculty concluding
that Wisconsin’s appellate process was “ineﬀective to protect
rights secured by the United States Constitution” and allowed
Carter to proceed straight to federal court under § 2254. Id. at
716, 723.
 II
 A
 What James Evans has experienced over the last twenty
years troubles us just as much. In 1998 Illinois authorities
charged Evans with the murder of Nekemar Pearson. While
awaiting trial, Evans asked his cousin and cellmate, Tommie
Rounds, to kill two witnesses to Pearson’s murder. Rounds
secretly recorded those conversations for the authorities. State
charges followed for soliciting murder, and in 1999 two sepa-
rate juries convicted Evans of both murder and solicitation.
He received consecutive sentences of 60 years for the murder
and 47 years for soliciting murder. After Illinois courts af-
ﬁrmed both convictions on direct appeal, Evans took the next
step available to him—ﬁling a petition for postconviction re-
lief in state court in 2003. He alleged that he was not only in-
nocent but also that the prosecution had engaged in serious
misconduct in both cases.
 It is now 2023—some twenty years later—and the Illinois
courts still have not resolved his claims for postconviction re-
lief. This extraordinary delay has stemmed in no small part
4 No. 21-1704

from the state’s own conduct, both in its capacity as a re-
spondent to the litigation and as the state trial court itself. A
few examples prove the point.
 Take Evans’s discovery requests. Evans alleged that the
state manipulated the audiotapes of his conversations with
Rounds and induced witnesses to perjure themselves at his
solicitation trial. To prove those claims, Evans repeatedly
asked the state to produce the tapes, beginning in at least De-
cember 2008. (Evans claims he had requested the tapes as
early as 2005, but the record is unclear on that point.) And
multiple times, the trial court ordered the state to comply.
First the court issued an order in December 2008 instructing
the state to “provide all copies” of the tapes. The state did not
comply. Then, in June 2009, the court directed that since the
litigation was “now six years old,” “all … productions,” in-
cluding the tapes, “are to be completed immediately.” The
state still did not comply. In July 2010 the court found itself
ordering the state to hand over the tapes yet again, this time
within ten days. While the state may have produced some
tapes after this order, it failed to produce others. It was not
until June 2011—nearly a year past the ten-day deadline set
forth in the July 2010 order and two-and-a-half years after the
court’s ﬁrst order—that the state came forward with more of
the missing tapes.
 But that was not the end of Evans’s discovery saga. While
the state had produced some relevant tapes, Evans had still
not received others. The trial court ordered the state to pro-
duce the remaining tapes in September 2011, but the state
claimed that it did not have them in its possession. Retrieving
them should not have been diﬃcult: the trial court had the
tapes (at least the ones introduced into evidence at Evans’s
No. 21-1704 5

trials) in the underlying dockets for Evans’s two cases and, by
June 2011, was aware that the prosecutors had not located
them. But another two years passed before the clerk’s oﬃce
gave Evans permission to review the exhibits. In a hearing in
March 2012, the trial court alluded to why it took so long to
ﬁnd the tapes—it had forgotten to search the dockets for both
of Evans’s underlying trials because it had “overlooked the
fact that you actually have two cases here.” And despite the
clerk’s oﬃce apparently locating the exhibits in 2013, Evans
still maintains that he has not received all the tapes.
 Litigators know discovery can be tedious and time con-
suming. But the discovery process should not have brought
Evans’s pursuit of postconviction relief to a halt like this. In-
deed, the trial court tried to tell Evans at least once that he did
not need the tapes because the initial phases of the postcon-
viction proceedings focused only on the parties’ pleadings,
not evidence. To our eye, the trial court was right: all Illinois
law required Evans to do at that step of the postconviction
proceedings was show that he had a suﬃcient basis for his
claim. He remained free to request the same materials when
the court turned to the merits. But Evans represented himself
for a signiﬁcant portion of the discovery period (from 2010 to
2012), and he did not appear to understand how the postcon-
viction relief process worked. The trial court had also assured
Evans that it would help him secure the materials he had re-
quested, which he believed were central to his claims. Adding
to the mixed messaging, the court told Evans in 2012 that the
delay “isn’t really your fault,” that “the State’s Attorney
maybe hasn’t been clear on who has what records,” and that
the court “want[ed] to get that [confusion] resolved.” And so
Evans’s case remained in limbo.
6 No. 21-1704

 It was not until July 2014, when the state ﬁled its motion
to dismiss, that the proceedings began to move toward the
merits. At that point the trial court acted immediately, deny-
ing the motion in early August. But then the proceedings
came to a standstill again. Neither side took any action to ad-
vance the litigation until the state moved for an evidentiary
hearing in 2020—about eight months after Evans had ﬁled his
§ 2254 habeas petition in federal court. So far as we can tell,
the state court evidentiary hearing has yet to take place.
 To be sure, the discovery process has not accounted for the
entire delay. Other setbacks—continuances, cancelled hear-
ings, attorney withdrawals over conﬂicts of interest, and
lengthy periods of inactivity—have contributed signiﬁcantly
to the decades-long wait. Evans and his counsel caused many
of those delays. The state caused many others. And the state
trial court itself entered a signiﬁcant number of continuances
and hearing cancellations into the docket seemingly without
explanation, leading to extended periods of dormancy, some
reaching almost three years. By our measure, all involved bear
at least some responsibility.
 In 2018 Evans sought a writ of mandamus from the Illinois
Supreme Court. After detailing his discovery challenges and
the related production delays, he asked for an order directing
the state to comply with the discovery requests and the circuit
court to adjudicate his case. The court denied his motion.
 Frustrated and out of options, Evans turned to federal
court for relief in 2019. At that point it had been over 16 years
since he ﬁrst sought postconviction relief in Illinois state
court. Evans contended that the exhaustion requirement oth-
erwise mandated by § 2254(b)(1) no longer applied because
Illinois’s postconviction process had proved ineﬀective for
No. 21-1704 7

him in light of the inordinate delay he continued to experience
in the state trial court. He even took care to explain how the
delay had already prejudiced his case: two of the witnesses
supporting his claims of prosecutorial misconduct had died
during his pursuit of relief.
 The state pressed a diﬀerent narrative. It conceded that
Evans’s wait was inordinate. But it then picked apart the time-
line piece by piece, claiming that Evans himself had caused
almost all of that delay and therefore could not seek relief in
federal court until the Illinois postconviction process had run
its course.
 The district court adopted the state’s reasoning and found,
without holding an evidentiary hearing, that the state bore re-
sponsibility for only seven months of the delay. It therefore
dismissed Evans’s petition for failure to exhaust state court
remedies.
 Evans now appeals.
 B
 A delay of twenty years and counting is inordinate. In-
deed, just two years ago we described Marvin Carter’s four-
year wait, only a fraction of what Evans has faced, as “extreme
and tragic.” Carter, 10 F.4th at 716. We have reached the same
conclusion for even shorter delays of three-and-a-half years,
see Lowe v. Duckworth, 663 F.2d 42, 43 (7th Cir. 1981), or even
just seventeen months, see Dozie v. Cady, 430 F.2d 637, 638 (7th
Cir. 1970) (per curiam). The only question, then, is whether
the delay Evans has experienced is meaningfully attributable
to the state. It was—in both a narrow and a broad sense.
 Start with a narrow view of what happened. The state bore
responsibility for material portions of the total delay, a fact
8 No. 21-1704

that is most clear when we examine the discovery mess with
the audiotapes. Remember that Evans had begun requesting
the audiotapes by at least December 2008, and in all likeli-
hood, even earlier. But the prosecutors were still turning over
tapes in June 2011, almost three years later. Setting aside Ev-
ans’s claim that this ﬁgure is an underestimate, a delay of
nearly three years would qualify as inordinate by itself. See
id.
 This three-year delay was also unjustiﬁable. Clearly, the
state was responsible for the delay—it was the state, not Ev-
ans, that fell short of its discovery obligations. See Carter, 10
F.4th at 723. Worse still, the state has failed to explain why it
took so long to comply with a routine discovery request for a
set of audiotapes. Its noncompliance is all the more unsettling
when we consider the fact that Evans requested the tapes
many times over, both through counsel and in letters that Ev-
ans himself ﬁled with the Illinois trial court. For its part, the
trial court ordered the state to comply repeatedly, setting
deadlines that the state twice failed to meet.
 We could conclude that the delay Evans faced was unjus-
tiﬁable based on this three-year production delay alone. See
Mucie v. Missouri State Dep’t of Corr., 543 F.2d 633, 636 (8th Cir.
1976) (ﬁnding ineﬀective process where “it appears the state
has been unnecessarily … dilatory”). But as Evans observes,
the state’s contributions to the audiotape delay continued
long after that point.
 Although the prosecutors produced some tapes by June
2011, Evans did not receive permission to review others until
September 2013. Here, too, the state played a major role in
dragging this episode out. The exhibits that Evans requested
were in the state trial court’s possession all along—in the case
No. 21-1704 9

dockets maintained by the court. But the court—fully nine
years into the litigation—had lost sight of the fact that Evans
sought relief for two separate cases, and therefore failed to
search both dockets for the missing exhibits. There is no way
to see this part of the delay as attributable to anyone other
than the state. See Carter, 10 F.4th at 723–24.
 Now step back. A broader perspective of the situation only
reinforces our conclusion. At a high level, Evans experienced
a breakdown in the state’s postconviction process. We see
things that way not just because twenty years have now
passed with Evans’s case still pending, but also because the
state court docket shows a general lack of action or urgency
by all involved. The prosecutors seem intent on allowing the
case to linger indeﬁnitely, and the state court, as best we can
tell, seems to have done nothing to move things along despite
recognizing the barriers to relief that Evans faced. See Story v.
Kindt, 26 F.3d 402, 406 (3d Cir. 1994) (concluding a state pro-
cess was ineﬀective where the Pennsylvania “Court of Com-
mon Pleas neglected [the petitioner’s] case for almost eight
years” due to outdated docket management procedures).
 True enough, Evans himself insisted on receiving all of the
tapes before allowing the proceedings to move on to the mer-
its. And he refused to budge when the state trial court ex-
plained that he did not need all of the tapes yet. But at some
point, the delay—and Evans’s confusion—should have
spurred the state trial court and the defendants named in the
state postconviction proceeding to act. See Carter, 10 F.4th at
723–24. Rather than take some step to move the litigation for-
ward, however, it certainly seems the state continued to talk
past Evans. What alarms us so much about all of this is that
the state trial court and the prosecutor’s oﬃce apparently
10 No. 21-1704

lacked a mechanism to break up the impasse or otherwise
manage Evans’s petition. The state’s “seriously deﬁcient”
management of Evans’s claims also rendered the postconvic-
tion relief process ineﬀective. Story, 26 F.3d at 406; see also
Carter, 10 F.4th at 723 (ﬁnding ineﬀective process based on the
“systemic deﬁciency” in the state’s management of its appeals
process).
 C
 For its part, the state would have us divvy up the proceed-
ings into bits and pieces, and then measure who—Evans or
the state—is responsible for a greater amount. We decline to
turn § 2254(b)(1)(B) into a mechanical accounting exercise.
The proper analysis cannot come from dividing up calendars
or tallying delays in an Excel spreadsheet. No doubt Evans
and his counsel contributed to some of the overall delay. See
Lane, 957 F.3d at 365 (explaining that delays in collateral re-
view that are caused by the petitioner’s counsel are attributa-
ble to the petitioner and not the state). But there is no ignoring
the state’s responsibility for signiﬁcant portions of the total
delay—a fact it mostly fails to acknowledge. The state’s role
in this saga provides ample grounds to conclude that its rem-
edies proved ineﬀective.
 On a more granular level, the state suggests that Evans
himself was responsible for the state’s failure to comply with
its discovery obligations. As the state observes, Evans’s ap-
pointed counsel withdrew during the same time period. The
state suggests that this withdrawal was the true cause of any
delay, and therefore that Evans (and not the state) was at fault.
Even if we disagree, the state tells us that the tapes were rele-
vant solely to the solicitation conviction and therefore could
No. 21-1704 11

not excuse Evans’s failure to exhaust state remedies for the
murder conviction.
 Both arguments are strained. The state has not explained
why the withdrawal of Evans’s attorney would have pre-
vented the state from fulﬁlling its own, independent discov-
ery obligations. As for the relevance of the tapes, Evans
wanted them to bolster his overarching allegation—fully ap-
plicable to both of his convictions—that the state had engaged
in prosecutorial misconduct.
 We also need to pause on the district court’s analysis be-
low. The court does not seem to have rolled up its sleeves with
the particulars of the factual record. One error in particular
stands out. The district court accepted the state’s contention
that it had complied with Evans’s discovery request for the
tapes within two months. According to the state and the dis-
trict court’s version of events, the court ﬁrst ordered produc-
tion in July 2010, and the state complied by September 2010.
But that timeline is inaccurate. The state court docket plainly
shows that Evans had a court order for the production of the
tapes by December 2008, not July 2010. And of course, the dis-
covery issues—and the state’s role in them—continued well
past September 2010.
 III
 Who knows whether Evans will win or lose his pursuit of
postconviction relief. That does not concern us in the least.
Our focus is on why the standstill remains twenty years after
Evans began his pursuit of relief in the Illinois courts. His cir-
cumstances remind us of what we emphasized just two short
years ago, albeit in the direct appeals context: “The length of
the delay should have sounded an alarm bell within the [state]
12 No. 21-1704

courts,” and “even the Attorney General’s oﬃce.” Carter, 10
F.4th at 723. Instead, the state insists on “point[ing] its ﬁnger”
at Evans while disclaiming its own responsibility for this pro-
cedural failure. Id. at 723–24.
 Our role is not to supervise state courts. “Obviously, the
state has no obligation to provide appellate or post-conviction
remedies.” St. Pierre v. Cowan, 217 F.3d 939, 949 (7th Cir. 2000)
(discussing the application of due process to state postconvic-
tion relief). “[B]ut if it has chosen to do so,” we may evaluate
whether those remedies are “ineﬀective” within the meaning
of § 2254(b)(1)(B)(ii). Id. And here, Illinois’s postconviction
remedies proved “ineﬀective” for Evans. Indeed, what Evans
experienced was nothing short of a breakdown in state pro-
cesses.
 So, with an accompanying sense of urgency, we VACATE
and REMAND the district court to review Evans’s petition,
consistent with this opinion.